SIERRA CLUB, et al.

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, et al.

No. CIV.A. WMN–97–3838.

United States District Court,
D. Maryland.

Sept. 10, 2001.

ener University School of Law, Wilmington, DE, for Sierra Club.

William J. White, Earth Justice Legal Defense Foundation, Washington, DC, for Chesapeake Bay Foundation.

Howard I. Fox, Washington, DC, Simon K. Walton, Schultheis & Walton, P.A., Baltimore, MD, James Robert May, Widener University School of Law, Wilmington, DE, James M. Stuhltrager, Widener University School of Law, Wilmington, DE, for American Littoral Society.

James H. Curtin, Office of General Counsel, U.S. Environment Protection Agency, Washington, DC, John A. Sheehan, U.S. Department of Justice, Washington, DC, P. Michael Cunningham, Office of U.S. Attorney, Baltimore, MD, Lois J. Schiffer, U.S. Department of Justice, Washington, DC, Lynne A. Battaglia, U.S. Attorney's Office, Baltimore, MD, Cynthia A. Drew, U.S. Department of Justice, Washington, DC, for United States Environmental Protection Agency, Carol Browner and W. Michael McCabe.

J. Joseph Curran, Jr., Office of the Attorney General, Baltimore, MD, Jennifer L. Wazenski, Baltimore, MD, Denise Ferguson-Southard, Baltimore, MD, for State of Maryland.

Ronald M. Cherry, McGuire Woods LLP, Baltimore, MD, Frank Paul Calamita, III, McGuire Woods Battle & Boothe, LLP, Richmond, VA, for Maryland Association of Municipal Wastewater Agencies, Inc.

Marc K. Cohen, George Whitthorne Kelly, Ober Kaler Grimes and Shriver, Baltimore, MD, for Maryland Chamber of Commerce.

Cynthia A. Drew, U.S. Department of Justice, Washington, DC, for Bradley Campbell.

Simon K. Walton, Schultheis & Walton, P.A., Baltimore, MD, James Robert May, Widener University School of Law, Wilmington, DE, James M. Stuhltrager, Wid-

*MEMORANDUM*

NICKERSON, District Judge.

Before the Court are Plaintiffs' Motion for Summary Judgment (Paper No. 98); Intervenor Maryland Association of Municipal Wastewater Agencies, Inc.'s Motion for Partial Summary Judgment (Paper No. 110); and Defendant Environmental Protection Agency's Cross–Motion for Summary Judgment (Paper No. 112). All motions have been exhaustively briefed and are ripe for decision. Upon a review of the motions and the applicable case law, the Court determines that no hearing is necessary (Local Rule 105.6) and that: Maryland Association of Municipal Wastewater Agencies, Inc.'s motion for partial summary judgment will be granted; Plaintiffs' motion for summary judgment will be granted as to Counts I, V, and VI of the 1998 complaint and denied as to all other counts; and, Defendant Environmental Protection Agency's cross-motion for summary judgment will be granted as to Counts I, II, III, and V of the 1997 complaint and denied as to all other counts.[1]

## I. BACKGROUND

In 1972, Congress enacted the Federal Water Pollution Control Act ("Clean Water Act" or "Act"), 33 U.S.C. § 1251, *et seq.*, to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *Id.* at § 1251(a). Pursuant to the Act, state's are required to take certain actions, such as the establishment of water quality standards, the identification of waters that do not meet those standards, establish proper pollutant load limits to insure that polluted waters achieve the water quality standards, and

the adoption of a continuing planning process that is consistent with the Act. *See generally* 33 U.S.C. § 1313. All of these actions are subject to EPA review and approval. *See id.* In addition, pursuant to the Endangered Species Act ("ESA"), 16 U.S.C. § 1531, *et seq.*, before undertaking any action that may affect an endangered species, threatened endangered species, or critical habitat, all federal agencies must "insure that any action authorized, funded, or carried out by such agency" is not likely to jeopardize such species or habitat. 16 U.S.C. § 1536(a)(2).

Plaintiffs Sierra Club, Chesapeake Bay Foundation, and American Littoral Society, brought this suit[2] against the United States Environmental Protection Agency ("EPA"), Carol Browner, the Administrator of the EPA, and Bradley Campbell, EPA's Region III Administrator (hereinafter "Regional Administrator"), alleging that the EPA failed to fulfill certain duties under the Clean Water Act and the ESA, and that certain other duties that were performed in a manner that was arbitrary, capricious and in abuse of discretion. The Court granted the Maryland Association of Municipal Wastewater Agencies, Inc.'s ("MAMWA") and the Maryland Chamber of Commerce's motions to intervene as party defendants. In addition, the Maryland Department of the Environment has appeared as *amicus curiae.*

On August 6, 1999, intervenor MAMWA filed, pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6), a motion to dismiss Counts IV and V of the 1997 complaint and Count III of the 1998 complaint. In a memorandum and order dated September 13, 2000, MAMWA's motion was granted in part and denied in part in that:

1. For the reasons stated *infra,* Counts II and IV of the 1998 complaint will be dismissed as moot. *See infra* note 22 and accompanying text.

2. Originally two suits were filed, WMN–97–3838 and WMN–98–927. The 1998 case was consolidated with the 1997 action by order of this Court dated May 22, 1998.

Count IV of the 1997 complaint and Count III of the 1998 complaint were dismissed; and, Plaintiffs were given 20 days to file an amended complaint as to Count V of their 1997 complaint. Pursuant to that Order, Plaintiff sought, and obtained, leave of Court to file an amended complaint. Under the amended 1997 complaint and the 1998 complaint, the remaining claims are: Counts I and II of the 1997 complaint (challenge to EPA decisions approving Maryland's 1996 and 1998 section 303(d) lists); Count V of the 1997 complaint (challenge to EPA decision not to step in and establish TMDLs for Maryland); Count III of the 1997 complaint (EPA's alleged violation of the Administrative Procedure Act's notice and comment requirement); Counts I, II, and IV of the 1998 complaint (EPA's alleged violation of the Clean Water Act and the Administrative Procedure Act with respect to Maryland's continuing planning process); and, Counts V and VI of the 1998 complaint (alleged ESA violations). Subsequently, motions for summary judgment were filed by both parties. A motion for partial summary judgment, as to Count V of the 1997 complaint, was also filed by MAMWA.

## II. STANDARDS OF REVIEW

### A. *Summary Judgment*

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). For purposes of summary judgment, a dispute about a fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if, when applied to the substantive law, it affects the outcome of litigation. *Id.*

A party seeking summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying the portions of the opposing party's case which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party "is entitled to have all reasonable inferences ... drawn in [its] favor." *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1129 (4th Cir.1987).

If the movant demonstrates that there is no genuine issue of material fact and that he is entitled to summary judgment as a matter of law, the non-moving party must, in order to withstand the motion for summary judgment, produce sufficient evidence in the form of depositions, affidavits or other documentation which demonstrates that a triable issue of fact exists. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. Unsupported speculation is insufficient to defeat a motion for summary judgment. *Felty*, 818 F.2d at 1128 (citing *Ash v. United Parcel Serv., Inc.*, 800 F.2d 409, 411–12 (4th Cir.1986)). Additionally, the existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. Instead, the evidentiary materials must show facts from which the finder of fact could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

### B. *Administrative Procedure Act*

■ When a challenge is made to the substance of an agency action, judicial review under the Administrative Procedure Act ("APA"), *see* 5 U.S.C. § 561, *et seq.*, is appropriate. *See Scott v. City of Hammond, Ind.*, 741 F.2d 992, 995 (7th Cir. 1984) (citing *United States Steel Corp. v. Train*, 556 F.2d 822, 836–37 (7th Cir. 1977)). In performing such a review,

"[t]he reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The APA also authorizes courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

■■■ The APA's standard of review is highly deferential and presumes the agency action to be valid. *Ethyl Corp. v. Environmental Protection Agency*, 541 F.2d 1, 34 (D.C.Cir.) (*en banc*), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976). Plaintiffs bear the burden of overcoming this presumption of validity. *See Natural Resources Defense Council, Inc. v. Fox*, 93 F.Supp.2d 531, 538 (S.D.N.Y. 2000) (citing *Environmental Defense Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C.Cir.1981)). The reviewing court cannot simply substitute its judgment for that of the agency. *Id.* Instead, the court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Natural Resources Defense Council*, 93 F.Supp.2d at 537 (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)).

■■■ An agency decision is deemed to be "arbitrary, capricious, an abuse of discretion" if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Natural Resources Defense Council*, 93 F.Supp.2d at 537 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*

*Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)) (internal quotation marks omitted). In this context, when an agency action is held to be invalid, the court's power is limited to vacating the unlawful agency action and remanding the matter to the agency for further proceedings, or compelling agency action that has been unlawfully withheld or unreasonably delayed. *Natural Resources Defense Council*, 93 F.Supp.2d at 536. *See also, Alaska Ctr. for the Env't v. Browner*, 20 F.3d 981, 986–87 (9th Cir.1994) (stating that the manner and substance of achieving compliance is best left to the agency); *Idaho Sportsmen's Coalition v. Browner*, 951 F.Supp. 962, 969 (W.D.Wash.1996) (remanding, for a second time, TMDL submission schedule development to the EPA despite the fact that the schedule previously developed by the EPA, pursuant to court order, was found to be arbitrary, capricious and an abuse of discretion).

## III. DISCUSSION

### A. Counts I and II of 1997 Complaint: Challenge to EPA *Decision Approving Maryland's 1996 and 1998 § 303(d) Lists*

Section 303(d)(1) of the Act requires that every state identify those waters within its boundaries that do not meet, or are not expected to meet, their established water quality standards even after the imposition of various enumerated controls and treatments. 33 U.S.C. § 1313(d)(1). This submission is known as a section 303(d) list. Waters identified on this list must be ranked according to priority for treatment based on designated uses for the water and the severity of its impairment. 33 U.S.C. § 1313(d)(1)(A). EPA has promulgated various regulations under section 303(d). Pursuant to these regulations, the 303(d) list is to be compiled using all "existing and readily available water quality-related

data and information." 40 C.F.R. § 130.7(b)(5). In addition, "[e]ach State shall provide documentation ... to support the State's determination to list or not list its waters." 40 C.F.R. § 130.7(b)(6).

Upon submission of the list, the Regional Administrator "shall either approve or disapprove" the list "not later than thirty days after the date of submission." 33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(2). The list *shall* be approved only if it meets the requirements of 40 C.F.R. § 130.7(b).[3] 40 C.F.R. § 130.7(d)(2) (emphasis added). If the Regional Administrator disapproves the 303(d) list submission, then he shall, "not later than thirty days after the date of such disapproval identify such waters in such state." 33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(2).

Initial submissions were due 180 days after the date of publication by the EPA of the first identification of pollutants suitable for load calculation. 33 U.S.C. § 1313(d)(2). EPA was required to publish such identification by October 18, 1973. 33 U.S.C. § 1314(a)(2)(D). EPA, however, did not actually publish its first

identification of pollutants until December 28, 1978. 43 Fed.Reg. 60662, 60665 (December 28, 1978). Therefore, the states' initial 303(d) submissions were due no later than June 26, 1979, 180 days after EPA's publication date. Maryland did not make its initial 303(d) submission until November 5, 1992.

After the initial submission, states are required to make additional section 303(d) submissions to the EPA from "time to time." 33 U.S.C. § 1313(d)(2). EPA regulations require states to submit their additional submissions biennially, on April 1 of every even numbered year. 40 C.F.R. § 130.7(d)(1). Maryland made additional submissions to the EPA on December 23, 1994, November 13, 1996, and August 7, 1998. Each submission was approved by the EPA.

■ As a preliminary issue, EPA argues that its approval of Maryland's 1998 list moots the challenge to its approval of Maryland's 1996 list. Plaintiffs, and the Court, disagree on the ground that the challenge to the 1996 list falls under the "capable of repetition yet evading review" exception to the mootness doctrine.[4]

---

**3.** Section 130.7(b) requires states to:

identify the WQLSs [water quality limited segments] within their boundaries that still require TMDLs and that will not meet water quality standards even after various enumerated pollution control regulations are imposed or that will not protect indigenous shellfish, fish, and wildlife even after various enumerated thermal discharge limitations are imposed[;] ... rank these WQLSs according to priority, taking into account the severity of the pollution and the uses to be made of the water[;] ... identify the pollutants causing or expecting to cause violations of water quality standards[;] ... identify specifically those waters targeted for TMDL development in the next two years[;] ... assemble and evaluate all existing and readily available water quality-related data in developing this list ... [;] and,

... provide certain specified documentation to EPA in support of its decision to list or not to list its waters.
*American Canoe Ass'n, Inc. v. EPA,* 30 F.Supp.2d 908, 918 (E.D.Va.1998).

**4.** Ordinarily a court may not hear a case that is moot. An exception to this general rule permits a court to hear a case "that does not present a live controversy when 'two conditions exist: (1) the challenged action must be in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there must be a reasonable expectation that the same complaining party will be subject to the same action again.'" *American Canoe,* 30 F.Supp.2d at 916 (quoting *Kennedy v. Block,* 784 F.2d 1220, 1223 (4th Cir.1986)). Here, the list approval process satisfies both conditions.

Plaintiffs allege that the EPA abused its discretion in approving Maryland's 1996 and 1998 § 303(d) lists because the lists do not include all impaired waters.[5] *See generally, Pronsolino v. Marcus,* 91 F.Supp.2d 1337, 1343 (N.D.Cal.2000) (stating that 303(d)(1) requires all impaired waters to be included in list); *Idaho Sportsmen's Coalition v. Browner,* Civil Action No. C93–943WD at 7 (W.D. Wash. April 14, 1994) ("The agency must reject a list that fails to identify all waters that do not or are not expected to meet applicable water quality standards."). EPA disagrees with Plaintiffs' assessment and asserts that the approval decisions were "reasonable" because Maryland, in devising the lists, complied with EPA's regulations and the Clean Water Act, which, according to the EPA, do not prevent the EPA or states from evaluating available data and, based on that data, reaching a decision as to whether or not a water should be listed. *See* 40 C.F.R. § 130.7(b)(6). Therefore, to determine if the EPA's approval of Maryland's 1996 and 1998 303(d) lists was arbitrary, capricious, or an abuse of discretion, the Court must address each of the alleged omissions.

#### i. Section 305(b) Report

33 U.S.C. § 1315(b) requires that, on a biennial basis, each state prepare and sub-

---

First, list submissions are due by April 1 in every even numbered year. 40 C.F.R. § 130.7(d)(1). For litigation purposes, the time span between list submissions is shortened by the fact that final submissions are routinely submitted well past the April 1 deadline. For example, Maryland's final version of its 1996 list was not submitted until November 13, 1996, *see* Dec. 31, 1996 EPA Letter to Nishida, and the final version of its 1998 list was not submitted until August 7, 1998. *See* Sept. 28, 1998 EPA Letter to Nishida. EPA then had 30 days in which to approve or disapprove each submission. If a person wants to challenge the EPA action, the Act requires a 60–day notice prior to the instigation of any suit. *See* 33 U.S.C. § 1365(b). Thus, the time available for judicial review of any given list is far less than two years. "Such brief spans of time have repeatedly been recognized to be too short to permit full litigation of a matter." *American Canoe,* 30 F.Supp.2d at 916 (finding, in nearly identical circumstances, that the first condition is satisfied). As to the second condition, it is immediately apparent that there is a reasonable expectation that Plaintiffs will be exposed to the same action again; "namely, whether EPA's treatment of the 1998 § 303(d) list will suffer from the same alleged inadequacies as its treatment of the 1996 § 303(d) list." *Id.* at 917 (finding that, in partially approving the 1998 list, to the extent the deficiencies complained of in the 1996 list were remedied, those deficiencies were moot). Here, the 1996 list was incorporated, in toto, into the 1998 list and both lists were approved in their entirety. Therefore, because any alleged deficiencies were not remedied, the challenge to the 1996 list also satisfies the second condition and is not moot.

**5.** Plaintiffs also assert that the approval was unlawful because Maryland does not have an adequate water quality monitoring program in place. *See* 33 U.S.C. § 1256(e) (stating that grants for pollution controls prohibited to states not establishing water quality monitoring procedures); 40 C.F.R. § 130.4(a) (requiring that "[i]n accordance with [section 1256(e)], States must establish appropriate methods and procedures ... necessary to compile and analyze data on the quality of waters of the United States and, to the extent practicable, ground-waters"). Plaintiffs, however, have provided no support for the contention that an adequate monitoring program is explicitly required prior to the EPA's approval of a 303(d) list submission. *See* 40 C.F.R. § 130.7(b)(5) (stating that "all existing and readily available water quality-related data and information" is to be used in devising the 303(d) list). Nor have Plaintiffs cited any section of the Act or EPA regulations to indicate what is considered an "adequate" water quality monitoring program. *See Alaska Ctr. for the Env't v. Reilly,* 796 F.Supp. 1374, 1380 (W.D.Wash.1992), *aff'd by* 20 F.3d 981 (1994) ("The determination of what, *if any,* water quality monitoring would be both appropriate and practicable is left to the Agency's discretion.") (emphasis added).

mit a water quality assessment report, referred to as a 305(b) Report, to the EPA. EPA regulations require that, in devising a 303(d) list, at a minimum, the term "all existing and readily available" data includes waters identified by the state on its most recent 305(b) Report as "partially meeting" or "not meeting" designated use or as "threatened." 40 C.F.R. § 130.7(b)(5)(i). That same regulation also provides that waters listed in the 305(b) Report need not be included on the 303(d) list as long as the rationale for the decision not to list such waters is provided. 40 C.F.R. § 130.7(b)(6)(iii).

Plaintiffs contend that the following waters from Maryland's 1996 305(b) Report and 1998 draft 305(b) Report (collectively "305(b) Report") were improperly omitted from its 303(b) lists: five waters listed as restricted/conditionally approved shellfish waters;[6] seven lakes listed as impaired;[7] and, five waters listed as restricted bathing areas.[8] EPA refutes Plaintiffs contention on the grounds that Maryland provided a reasonable explanation for the omissions[9] and/or that several of the waters allegedly omitted were actually listed.

Addressing the five shellfish waters first, Plaintiffs alleged that the EPA "invents" an exception, i.e., proximity to wastewater treatment plants, to support its decision to approve the lists. EPA counters that one water, Pokomoke Sound, is on the 303(d) list, and, as to the other four waters, Maryland was not required to list them because they are restricted as a precaution due to their proximity to wastewater treatment plants and not because technology-based limits are insufficient. *See* Attachment E, EPA Reply Brief. *See also*, Maryland's Operative 303(d) List Dated Aug. 1998 at 2–9 (stating that waters located near wastewater treatment plants are listed as a precautionary measure, which is an "important application of the principles and practices of public health protection and is not indicative of a water quality violation"). Because there is no data showing actual impairment of these waters or that existing pollution controls are insufficient, the waters need not be listed. *See* 40 C.F.R. § 130.7(b).

As to the seven lakes listed as impaired, EPA notes that six of the lakes are listed. The seventh lake, Blairs Valley, was not included on the 1997 lake report and, therefore, it need not be included on the 303(d) list. *See* Attachment C, EPA Reply Brief.

Finally, as to the five bathing areas, Plaintiffs incorrectly claim that EPA concedes that these waters have "long term chronic conditions" due to bacteria levels. While this is true as to the Snowy River and Nanticoke River–Cove Road bathing areas, these have been listed. *See* Attach-

---

**6.** The shellfish waters are: Atlantic Ocean, Pocomoke Sound, Big Annemessex River, Middle Chesapeake Bay, and Lower Chesapeake Bay.

**7.** The lakes are: Bishopville Pond, Duckett Reservoir, Conowingo Pool, Tridelphia River, Edgewater Village Lake, Blairs Valley Lake, and Piney Run River.

**8.** The bathing areas are: Snowy River, Camp Wright, Nanticoke River–Cove Road, Spa Creek, and Cascade Lake.

**9.** The explanation offered by Maryland centers on its view that the 305(b) Report and the 303(d) list have different purposes and rely on different methodologies. Specifically, that the 305(b) Report requires assessment of the quality of water regardless of the source of the impairment, while the 303(d) list only requires identification of waters for which technology-based effluent limits and other controls are not sufficient to implement applicable water quality standards and for which TMDLs are suitable to address actual or threatened impairment. *See* Maryland's Operative 303(d) List Dated Aug. 1998 at 2–3.

ment D, EPA Reply Brief. The Camp Wright River and Spa Creek bathing areas were not listed because the 1996 305(b) Report describes their closures as short-term. *Id.* Because the data does not support a finding that technology-based limits are insufficient, the waters need not be listed. *See* 40 C.F.R. § 130.7(b). Lastly, the Cascade Lake bathing area is not listed because the most recent data shows no violations of the water quality standards. *See* Attachment D, EPA Reply Brief.

■ Because Plaintiffs have failed to demonstrate that EPA's acceptance of the justifications offered by Maryland was unreasonable, EPA's decision as to these omissions must be upheld.

ii. *1984 304(1) List*

■ Section 304(1) of the Clean Water Act requires the identification of toxic "hot spots." *See* 33 U.S.C. § 1314(1). Plaintiffs assert that seven waters [10] identified on Maryland's 1984 304(1) list as failing to meet water quality standards for either conventional or toxic pollutants were omitted from its 303(d) lists. EPA claims that Maryland considered the 304(1) list but also considered more recent information. In approving Maryland's 303(d) lists, the EPA concluded that the decision to omit these waters was based on the more current information. This conclusion is supported by the very purpose of the 304(1) list, i.e., to identify and cure toxic "hot spots." The effective implementation of the individual control strategies called for in section 304(1) of the Act would cure the impairment in those waters and obviate the need to include those waters on the 303(d) list. As Plaintiffs have provided no

evidence that any of the omitted waters remain impaired, the Court has no grounds upon which to find that EPA's approval decision was arbitrary, capricious, or an abuse of discretion.

iii. *Waters Identified by Federal Agencies*

Section 303(d) lists are to include impaired waters and pollutants identified by federal, state, and local agencies. 40 C.F.R. § 130.7(b)(5)(iii). Plaintiffs point to the omission of 44 waters identified by the EPA as impaired by excessive levels of fecal coliform, *see* April 17, 1998 EPA Letter to Haire, Table 1, 31 waters identified by EPA as impaired based on Maryland Biological Stream Survey ("MBSS") data, *see id.* at Table 2, and 66 additional pollutants identified by EPA as causing impairments, *see* Plaintiffs' Exh. 17.[11] EPA asserts that Maryland provided reasonable explanations for the omission of these waters/pollutants and, based on those explanations, the waters/pollutants did not need to be included in the 303(d) list.

■ The 44 waters identified by the EPA as impaired by excessive levels of fecal coliform were omitted because of the lack of an appropriate number of samples. Plaintiffs argue that this is an insufficient reason for the omission because Maryland's own regulations, *see* COMAR § 26.08.02.03–3(A)(1)(a), require that five samples be taken per 30–day period and, had the regulation been followed, there would have been an adequate number of water quality samples upon which to properly make the decision to list or not to list. Plaintiffs, however, are incorrect in stating that COMAR § 26.08.02.03–3(A)(1)(a) re-

10. These waters are: Big Annemessex River, Little Elk Creek, Little Gunpowder Falls, Potomac River–Shenandoah to Monocacy, Upper Chesapeake Bay, Middle Chesapeake Bay, and Lower Chesapeake Bay.

11. The Court notes that the majority of the waters identified in Table 1 are identical to those identified in Plaintiffs' Exhibit 17.

quires a minimum of five samples per 30–day period. Instead, the regulation states that *readings* must be based on not less than five samples taken over a 30–day period. As there is no requirement that Maryland take a certain number of samples each month, the Court cannot find that EPA's acceptance of Maryland's justification for not listing these waters was arbitrary, capricious, or an abuse of discretion.

■ As to the 31 waters identified by the MBSS data as impaired, Maryland claimed, and the EPA accepted, that the MBSS is not reliable in making fact-specific decisions. *See* July 27, 1998 MDE Letter to EPA at 2 (expressing reluctance to use MBSS data to make regulatory conclusions about impairments in specific waterbody segments because individual MBSS samples are suspected of being highly variable); MBSS Information Sheet, Pls' Exh. 59 (indicating that the MBSS "may not be fully successful for assessing small watersheds"). Given that Maryland has provided an adequate explanation for not relying on MBSS data, the Court cannot find that the EPA's acceptance on this explanation was unlawful.

As to Plaintiffs concerns regarding the omission of 66 additional pollutants causing impairments, Maryland has provided a reasonable explanation for its decision not to list these waters, *see generally* Aug. 12, 1998 MDE Letter to EPA, the primary reason being that there "is insufficient data to determine a violation of water quality standards." *Id.* at 4–7. For the reasons stated *supra,* the Court finds that EPA's acceptance of this explanation was not unreasonable.

#### iv. *Thermal Variances and Anti–Degradation*

Each 303(d) list is to include all waters subject to thermal variance, *see* 33 U.S.C. § 1326(a), and all waters that do not meet anti-degradation standards. *See* 40 C.F.R. § 131.12(a). Plaintiffs allege that Maryland's 1996 and 1998 lists do not include such waters. Yet, Plaintiffs fail to identify any such impaired water, nor do they identify any available data that contains such information that Maryland did not consider. Because EPA's decision is presumed valid and Plaintiffs bear the burden of overcoming this presumption, Plaintiffs' failure to provide any evidence to support their position provides no basis upon which the Court could find that EPA's approval was arbitrary and capricious, or an abuse of discretion.

### B. Count V of 1997 Complaint: Challenge to EPA Decision Not *to Step In and Establish TMDLs for Maryland*

Under section 303(d), states must also establish the total maximum daily load ("TMDL") of pollutants that each WQLS can assimilate and still meet water quality standards. 33 U.S.C. § 1313(d)(1)(C).[12] These daily load limits are required for *all* WQLSs. *See, e.g., American Canoe,* 30 F.Supp.2d at 912; *Idaho Sportsmen's Coalition,* 951 F.Supp. at 967; *Sierra Club v. Hankinson,* 939 F.Supp. 865, 871 (N.D.Ga. 1996).

As with its initial identification of WQLSs, a state should have submitted its TMDLs to the Administrator of the EPA by June 26, 1979. Thereafter, a state is required to submit TMDLs to the EPA "from time to time." 33 U.S.C.

---

**12.** A TMDL consists of wasteload allocations, which are the portions of a receiving water's loading capacity allocated to point source discharges (e.g., industrial, commercial, and municipal discharges), and load allocations, which are the portions attributable to non-point sources of pollution (e.g., urban, agricultural, and silvicultural runoff) or natural background sources. 43 C.F.R. § 130.2(g), (h), and (i).

§ 1313(d)(2). The EPA must approve or disapprove a state's TMDLs within thirty days of submission. *Id.;* 40 C.F.R. § 130.7(d)(2). If the EPA disapproves of any TMDLs, it has thirty days from the date of disapproval to establish those TMDLs for the state. 33 U.S.C. § 1313(d)(2).

The record indicates that prior to September 1999, Maryland submitted and the EPA approved TMDLs for three waters in Maryland.[13] *See* Sept. 17, 1999 EPA Letter to Nishida. An additional 29 TMDL submissions have been made since September 1999.[14] Moreover, in November 1998, EPA and Maryland entered into a Memorandum of Understanding ("MOU")[15] which sets a schedule for TMDL development for all waters on Maryland's 1998 303(d) list,[16] except for mainstream Chesapeake Bay, by 2008. *See* MOU at 5. *See also,* Sept. 17, 1999 EPA Letter to Nishida at 1. Pursuant to the Chesapeake Bay Agreement, a TMDL for the Chesapeake Bay is to be established by 2011. *See* Sept. 17, 1999 EPA Letter to Nishida at 6. Maryland has also committed approximately 30 full-time staff to all phases of the 303(d) process, including TMDL development. *See* Sept. 13, 1999 MDE Letter to EPA.

In its letter dated September 17, 1999, EPA commented that it "firmly believes that the most efficient and effective approach for the Agency to implement its oversight responsibilities is to work in partnership with States to assist them in developing State TMDL programs that are consistent with the goals and requirements of the Clean Water Act." Sept. 17, 1999 EPA Letter to Nishida at 3. EPA further states that "[a]t present, EPA believes, in the exercise of its discretion, that Maryland has committed to develop and implement an effective section 303(d) program," which includes the development and implementation of TMDLs. *Id.* Therefore, "EPA believes it should not exercise its discretion to step into the state's shoes." *Id.* The letter goes on to provide a detailed

---

13. MAMWA asserts that wasteload allocations ("WLA"s) developed by the state should be counted as TMDLs. The Court, however, agrees with Plaintiffs that TMDLs and WLAs are not "functional equivalents." WLAs are not submitted to EPA for approval or disapproval, as is required by 33 U.S.C. § 1313(d)(2) for TMDLs. In addition, WLAs are developed assuming drought or low water conditions. They do not, therefore, address nonpoint sources of pollution. In contrast, TMDLs must take into account "seasonal variations," which would include both point and nonpoint sources of pollution. *See* 33 U.S.C. § 1313(d)(1)(C). *See also, Sierra Club,* 939 F.Supp. at 871 (finding that WLAs are not TMDLs because they are not daily loads, they are not for WQLSs, and they do not account for seasonal variations).

14. In addition to these submissions, MAMWA claims that Maryland's Tributary Strategies, developed as part of the Chesapeake Bay Program, should count as TMDLs because they exceed the TMDL requirements laid out in 33

U.S.C. § 1313(d)(1)(C). Plaintiffs argue that the Tributary Strategies are not TMDLs because they are unenforceable and are designed to address only a limited number of pollutants. The Court, however, need not address this issue as it finds that Maryland's recent emphasis on TMDL development is sufficient to uphold EPA's decision not to step in and take over TMDL development in Maryland.

15. Plaintiffs make much of the fact that the MOU is not enforceable. Yet, Plaintiffs have made no allegations that, since the MOU was signed in November 1998, Maryland or the EPA have not abided by its terms. In addition, if Maryland does not fulfill its obligations under the MOU, Plaintiffs are free to bring suit to require compliance.

16. While TMDLs are to be developed according to the 1998 303(d) list, that list is subject to additions or deletions as is appropriate. A TMDL does not have to be developed for any WQLSs deleted from the 1998 list.

basis for EPA's decision. Plaintiffs petitioned the EPA to reconsider its September 17, 1999 decision not to establish TMDLs in Maryland. In January 2000, the EPA announced that it would not change its earlier decision.

Plaintiffs now assert that EPA's decision not to establish TMDLs in Maryland is arbitrary, capricious, and an abuse of discretion in violation of the APA.[17] Plaintiffs request that the Court set aside EPA's decision and that the Court establish an expeditious schedule for EPA preparation of TMDLs for Maryland's WQLSs.

 Plaintiffs primary argument is that Maryland's present compliance does not eliminate decades of non-compliance. In light of Maryland's prior history, Plaintiffs contend that the EPA has a duty to step-in and develop TMDLs in Maryland. Plaintiffs, however, are wrong; "past compliance is irrelevant to the question of an agency's *present* compliance." *Natural Resources Defense Council,* 93 F.Supp.2d at 536 (emphasis in original). *See also, San Francisco Baykeeper, Inc. v. Browner,* Civil Action No. C–00–0132–CAL (N.D.Cal. Feb. 22, 2001) at 10 (stating that because only declaratory and injunctive relief sought, Court is most concerned with what is or what is not being done *presently* ) (emphasis added). This is particularly true where, as here, EPA's initial duty to develop TMDLs has not been triggered.[18] By upholding EPA's decision to leave TMDL development to the state, the Court lends credence to the Act's contemplation of "a partnership of state and federal governments, working together to assure that adequate water pollution controls are established nationwide, but with due regard for local and regional concerns." *Natural Resources Defense Council,* 93

---

**17.** Plaintiffs also allege that the decision violates the Clean Water Act. The Court need not, however, address the allegations under the Clean Water Act, as the Court, in its September 13, 2000 Memorandum, found that any challenge to EPA's exercise of its discretion is governed by the provisions of the APA, not the citizen suit provision of the Clean Water Act. *See* Sept. 13, 2000 Memorandum, WMN–97–3838, at 18–19.

**18.** EPA's duty is triggered either by EPA's disapproval of a TMDL submission, *see* 33 U.S.C. § 1313(d)(2), or by a state's long-term non-compliance such as to render no submission the equivalent of a decision by the state not to submit, i.e., "constructive submission." *See Scott,* 741 F.2d at 996–97. As to the first, the EPA has not disapproved any Maryland TMDL submission. Moreover, even had the EPA disapproved a specific Maryland TMDL submission, EPA's duty would only be in respect to developing that particular TMDL, not all TMDLs. Therefore EPA's duty has not been triggered by disapproval.

The constructive submission doctrine is inapplicable here. Maryland has made several TMDL submissions. This is not a case where Maryland has flatly chosen not to act. To find a constructive submission requires more egregious circumstances than these. *See Kingman Park Civic Ass'n v. EPA,* 84 F.Supp.2d 1, 6 (D.D.C.1999) ("An eighteen-year failure to calculate and submit [any] TMDLs constitutes a constructive—if not outright—determination that no TMDLs are necessary."); *Sierra Club,* 939 F.Supp. at 871 (only two TMDLs submitted and no long range plan); *Alaska Ctr. for the Env't,* 762 F.Supp. at 1425 (no TMDLs submitted; no list of impaired waters submitted; and 1990 305(b) Report indicating that TMDLs have "not been attempted" and making no promise to "attempt" them). *Cf. San Francisco Baykeeper,* Civil Action No. C–00–0132–CAL at 16–22 (finding no EPA duty to act in face of record showing that some WQLS lists and TMDLs were submitted and that EPA now working with California to bring California's TMDL program into compliance); *Natural Resources Defense Council,* 93 F.Supp.2d at 539 (EPA decision not to intervene upheld on basis of Memorandum of Agreement establishing 8–year schedule for all TMDLs on state's 1996 303(d) list and fact that New York submitted numerous proposed TMDLs during pendency of lawsuit); *Sierra Club, North Star Chapter v. Browner,* 843 F.Supp. 1304, 1313–14 (D.Minn.1993).

F.Supp.2d at 549 (citing *Arkansas v. Oklahoma,* 503 U.S. 91, 101, 112 S.Ct. 1046, 117 L.Ed.2d 239 (1992)).

Plaintiffs next challenge the length of the schedule approved by the EPA. According to Plaintiffs the time allotted to Maryland for TMDL development is unreasonably long and, therefore, EPA's approval constitutes an abuse of discretion. The Court disagrees. Under the APA, EPA's decision is presumed to be valid. Plaintiffs have provided no evidence to substantiate their claim that the length of time given to Maryland for TMDL development is unreasonably long. Here, the schedule calls for TMDLs to be developed for all waters but the Chesapeake Bay by 2008 and for the Chesapeake Bay by 2011. Similar time periods have been upheld in other jurisdictions. *See, e.g., Natural Resources Defense Council,* 93 F.Supp.2d at 539 (approving 8 year schedule for TMDL development); *Sierra Club,* 843 F.Supp. at 1314 (accepting 10 year schedule and commenting that "[a]lthough Minnesota and the EPA may not be implementing TMDLs as quickly as plaintiffs would like, the Act does not set deadlines for the development of a certain number of TMDLs"). *See also,* Sept. 17, 1999 EPA Letter to Nishida at 2 (stating that state schedules for TMDL development should normally extend from 8 to 13 years in length). Additionally, the EPA specifically stated that it

> does not believe that a five-year schedule [for TMDL development] would be reasonable in Maryland. A five-year schedule would require Maryland to develop complex TMDLs at such a rapid rate that Maryland could not reasonably be expected to (1) gather the necessary data and perform the necessary analyses

to identify the sources of the impairment, (2) estimate what the sources could achieve . . . , (3) identify practices for implementing the TMDL, and (4) provide adequate public involvement.

*Id.* at 4. Because the Court finds that the EPA has not abused its discretion in deciding to leave TMDL implementation in the hands of Maryland, summary judgment in favor of the EPA will be granted as to Count V of the 1997 complaint.[19]

## C. Count III of 1997 Complaint: EPA's Alleged Violation of *the APA's Notice and Comment Requirements*

The APA provides that "[g]eneral notice of proposed rule making shall be published in the Federal Register." 5 U.S.C. § 553(b). "After notice required by this section [is given], the agency shall give interested persons an opportunity to participate in the rule making through submissions of written data, views, or arguments." 5 U.S.C. § 553(c). These sections make up the APA's "notice and comment requirement."

There is no dispute that the EPA did not provide a public notice and comment period prior to its approval of Maryland's 303(d) lists or its approval of any TMDLs submitted by Maryland. Plaintiff alleges that this failure violates the APA because the 303(d) lists and TMDLs are "rules," the promulgation of which trigger the notice and comment requirements of the APA. EPA, contrarily, asserts that it had no duty to provide for notice and comment because the decisions at issue are not rule making.

█ The Court agrees with the EPA and finds that approval or disapproval of state submissions under the Clean Water

---

**19.** Likewise, MAMWA's motion for summary judgment as to Count V of the 1997 action

will also be granted.

Act is not rule making; it is only the actual development of the list or load that is rule making. Therefore, as to the initial submission to the EPA, it is the state, not EPA, which is required to meet the notice and comment requirements. *See City of Albuquerque v. Browner*, 97 F.3d 415, 425 (10th Cir.1996), *cert. denied*, 522 U.S. 965, 118 S.Ct. 410, 139 L.Ed.2d 314 (1997) (citing Fourth Circuit for proposition that, in this context, it is the states that engage in rule making, not the EPA, which is restricted to a reviewing capacity); *American Canoe Ass'n v. EPA*, 54 F.Supp.2d 621, 629 (E.D.Va.1999). It is only when the EPA disapproves a list or load and must "identify such [impaired] waters ... and establish such loads" that the EPA becomes subject to the public notice and comment requirements because, in such a situation, the EPA is the party engaged in rule making. *See* 33 U.S.C. § 1313(c)(4) (stating that if Administrator disapproves a state submission and must then promulgate a new or revised standard, the Administrator must adhere to the notice and comment requirements); 40 C.F.R. § 130.7(d)(2) (stating that if the Regional Administrator is required to devise a list or load limits then the "Regional Administrator shall promptly issue a public notice seeking comment on such listing and loadings").

In addition, the public policy considerations outlined in 40 C.F.R. § 25.3(c), i.e., fostering public awareness and opening the processes of government decision making, are satisfied by this regime. The public is provided notice and the opportunity to comment by the party devising the list or load limit. In the case of the state as rule maker, all comments are forwarded to the EPA as part of the administrative record. This affords the EPA the opportunity to review all comments and request additional information or clarification from the state prior to making a decision to approve or disapprove.

As the EPA simply approved Maryland's submissions, the EPA did not engage in rule making and was under no requirement to provide for public notice and comment. Therefore, summary judgment as to Count III of the 1997 complaint will be granted in favor of EPA.

**D. Counts I, II and IV of 1998 Complaint: EPA's Alleged Violation of the CWA and APA with Respect to Maryland's *Continuing Planning Process***

To ensure that plans are developed and implemented to achieve water quality standards in all of a state's waters, section 303(e) of the Clean Water Act requires each state to have a continuing planning process ("CPP") that is consistent with the Act. 33 U.S.C. § 1313(e). States were required to submit a proposed CPP to the Administrator of the EPA no later than February 17, 1973. 33 U.S.C. § 1313(e)(2). The EPA is required to approve or disapprove a state's proposed CPP within thirty days of its submission. *Id.* After the initial submission, the EPA is to review each state's approved planning process for the purpose of insuring that it is "at all times" consistent with the Clean Water Act. *Id.*

Plaintiffs allege that Maryland did not propose a CPP to the EPA until 1986.[20] Plaintiffs further assert that the EPA has not approved or disapproved the proposed CPP, or any other CPP, as required by the CWA. The EPA disputes Plaintiffs' assertions and claims that a CPP was submitted

**20.** Alternatively, Plaintiffs assert that any CPP submitted to the EPA prior to 1986 was never approved by the EPA.

and approved at some time prior to November 1995.

The Court, in its September 13, 2000 Memorandum and Order, found that, "at the time Plaintiffs' 1998 complaint was filed, EPA has not approved or disapproved the [1986] proposed CPP or any other CPP." *Id.* at 13. EPA has presented no evidence to sway the Court from its previous finding.[21] Based on this finding, the EPA, pursuant to section 1313(e)(2), is to either approve or disapprove Maryland's most recent CPP submission[22] within 90 days of the date of this order.[23]

**E. Counts V and VI of 1998 Complaint: Alleged ESA Violations**

The Endangered Species Act ("ESA"), 16 U.S.C. § 1531, *et seq.*, is the "most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 180, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). The ESA codifies Congressional findings that various species of fish, wildlife, and plants in the United States have either been rendered extinct or are threatened with extinction. 16 U.S.C. § 1531(a)(1) and (2). To minimalize additional threats, the ESA requires "that all Federal departments and agencies shall seek to conserve endangered and threatened species." 16 U.S.C. § 1531(c). In furtherance of this goal, "[e]ach Federal agency shall, in consultation with and with the assistance of the Secretary,[24] insure that any action authorized, funded, or carried out by such agency (hereinafter 'agency action'[25]) is not likely to jeopardize the continued existence of any endangered species or threatened endangered species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2).

To insure compliance with section 1536(a)(2), each Federal agency, with respect to any contemplated agency action, shall request of the Secretary information as to whether any species or habitat which

---

21. EPA's arguments, briefly stated, are as follows. First, EPA asserts that there is a paper trail indicating that the 1986 proposed CPP was intended to replace a previous CPP submitted in 1976. *See* 1986 Proposed CPP at 1 (stating that this CPP is "intended to replace the previous CPP submitted to the [EPA] in 1976"). This paper trail proves that a previous CPP had been submitted. EPA then points to the November 22, 1975 Fed.Reg. preamble which states that "[a]ll states have a continuing planning process which has been approved previously by EPA ..." as evidence that Maryland submitted, and EPA approved, a CPP prior to November 22, 1975. The flaw in EPA's reliance on the preamble is that Plaintiffs have provided evidence demonstrating that the preamble is incorrect. *See* Dec. 27, 1979 West Virginia Dept. of Natural Resources Letter to EPA (stating that the 1979 West Virginia CPP supersedes *original* CPP delivered to EPA in *April, 1976* ).

22. The MOU indicates that a revised CPP was to be submitted to the EPA on or before October 1, 1999. *See* MOU at 9. If such a

CPP was submitted, then the EPA is to approve or disapprove that CPP. If, however, no such CPP was submitted, then the EPA is to approve or disapprove the 1986 CPP.

23. Plaintiffs note, and the Court agrees, that, based on this finding, the remainder of Plaintiffs' CPP claims, i.e., failure to review, failure to disapprove 1986 CPP, and abuse of discretion under APA, are not ripe. Therefore, Counts II and IV of the 1998 complaint will be dismissed as moot.

24. "Secretary" refers to the Secretary of the Interior or the Secretary of Commerce.

25. Agency action has been broadly defined and refers to all activities or programs, of any kind, authorized, funded, or carried out, in whole or part, by Federal agencies. *See National Resources Defense Council v. Houston*, 146 F.3d 1118, 1125 (9th Cir.1998), *cert. denied*, 526 U.S. 1111, 119 S.Ct. 1754, 143 L.Ed.2d 786 (1999); *Defenders of Wildlife v. Babbitt*, 130 F.Supp.2d 121, 127 (D.D.C. 2001).

is listed or proposed to be listed may be present in the area of the proposed action. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(c). If no such species or habitat is in the area, then no further action under the ESA is required. If, however, the Secretary advises that such species or habitat *may* be present, then the agency must determine whether the proposed action "may affect" the species or habitat. *Id.* Additional action is required only if the agency determines that the action "may affect" the endangered species, threatened endangered species, or habitat. In such a situation, the agency must enter into formal consultation and a biological assessment is required. *Id. See also, Natural Resources Defense Council,* 146 F.3d at 1126; *Kentucky Heartwood, Inc. v. Worthington,* 20 F.Supp.2d 1076, 1084 (E.D.Ky.1998); *Florida Key Deer v. Stickney,* 864 F.Supp. 1222, 1228 (S.D.Fla.1994). The only exception to this stringent requirement is when the action agency and the Secretary, either after the agency prepares a biological assessment *or* as the result of informal consultation, agree that the agency action is not likely to affect any listed species or critical habitat. This concurrence must be in writing. 50 C.F.R. § 402.14(b)(1). *See also, Natural Resources Defense Council,* 146 F.3d at 1127; *Pacific Rivers Council v. Thomas,* 30 F.3d 1050, 1054 n. 8 (9th Cir.1994), *cert. denied,* 514 U.S. 1082, 115 S.Ct. 1793, 131 L.Ed.2d

721 (1995); *Hawksbill Sea Turtle v. Federal Emergency Mgmt. Agency,* 11 F.Supp.2d 529, 545 (V.I.1998); *Florida Key Deer,* 864 F.Supp. at 1228.

Plaintiffs allege that EPA violated section 7 of the ESA by failing to consult on EPA's approval of Maryland's water quality revisions in 1992, and 1995,[26] and EPA's approval of Maryland's 1996 [27] section 303(d) list.[28] EPA does not deny that it has failed to comply with ESA's section 7 requirements. Instead, as to the water quality revisions, EPA asserts that it is already in the process of curing the problem and anticipates completing consultation in the Spring of 2001. Therefore, according to EPA, it would be "redundant" for the Court to order consultation. As to Plaintiffs' ESA claims regarding the 303(d) list approval, EPA does not make any argument as to its failure to consult.

■■■ EPA, by its own admission, has failed to abide by its obligations under the ESA in approving Maryland's 1992 and 1995 water quality revisions and in approving Maryland's 1996 section 303(d) list submission. Therefore, Plaintiffs' motion for summary judgment as to these claims will be granted. EPA is to cure these violations by fulfilling the ESA's consultation requirements as to the 1992 and 1995 water quality standard revisions and the 1996 section 303(d) list approval.[29] EPA has 90

**26.** Plaintiffs also allege a section 7 violation in regard to EPA's approval of Maryland's 1990 water quality revisions. This claim is, however, time-barred as EPA's action took place more than six years prior to the filing of this suit. *See* 28 U.S.C. § 2401(a) (six-year statute of limitations for civil actions against United States). *See also, Kentucky Heartwood,* 20 F.Supp.2d at 1093.

**27.** Plaintiffs also allege a section 7 violation in regard to EPA's approval of Maryland's 1998 section 303(d) list. Plaintiffs have not,

however, amended their complaint to include this alleged violation.

**28.** Plaintiffs' allegations as to ESA violations in regard to CPP approval are moot as the Court has found that the EPA has not approved any Maryland CPP.

**29.** The Court notes that the EPA has begun the consultation process. To the extent that any actions required pursuant to this memorandum and order are duplicative of actions already taken by the EPA, they obviously need not be repeated.

days from the date of this memorandum and order to fulfill its consultation requirements. In addition, EPA is to abide by the ESA in any future actions it may take in regard to Maryland's duties under the Clean Water Act.

## IV. CONCLUSION

For the foregoing reasons, MAMWA's motion for partial summary judgment will be granted, and Plaintiffs' motion and EPA's cross-motion will each be granted in part and denied in part. A separate order consistent with this memorandum will issue.

### *ORDER*

Pursuant to the foregoing memorandum, and for the reasons stated therein, IT IS this day of September 2001, by the United States District Court for the District of Maryland, hereby ORDERED:

1. Plaintiff's Motion for Summary Judgment (Paper No. 98) is hereby GRANTED in part and DENIED in part in that judgment is GRANTED in favor of Plaintiffs as to Counts I, V and VI of the 1998 complaint;

2. That Intervenor Maryland Association of Municipal Wastewater Agencies, Inc.'s Motion for Partial Summary Judgment as to Count V of the 1997 complaint (Paper No. 110) is hereby GRANTED;

3. That Defendant Environmental Protection Agency's Cross–Motion for Summary Judgment (Paper No. 112) is hereby GRANTED in part and DENIED in part in that judgment is GRANTED in favor of the EPA as to Counts I, II, III and V of the 1997 complaint;

4. That Counts II and IV of the 1998 complaint are hereby DISMISSED as moot;

5. That Defendant EPA shall have 90 days from the date of this order to approve or disapprove Maryland's most recent CPP submission;

6. That Defendant EPA shall have 90 days from the date of this order to comply with all consultation requirements of the Endangered Species Act in respect to Maryland's 1992 and 1995 water quality standard revisions and EPA's approval of Maryland's 1996 section 303(d) list;

7. That this case is hereby CLOSED;

8. That any and all prior rulings made by this Court disposing of any claims against any parties are incorporated by reference herein and this order shall be deemed to be a final judgment within the meaning of Fed.R.Civ.P. 58; and

9. That the Clerk of the Court shall mail or transmit copies of the foregoing memorandum and this order to all counsel of record.