**AMERICAN LITTORAL SOCIETY and New Jersey Public Interest Research Group, Citizens Lobby, Plaintiffs,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY REGION, Christine T. Whitman, Administrator, and United States Environmental Protection Agency Region II, William J. Muszynski, Acting Regional Administrator,\* Defendants.**

**Civil Action No. 96–339 (MLC).**

United States District Court, D. New Jersey.

March 28, 2002.

---

\* Christine T. Whitman, Administrator, United States Environmental Protection Agency, is substituted for Carol Browner, and William J. Muszynski, Acting Regional Administrator,

United States Environmental Protection Agency, Region II, is substituted for Jeanne Fox pursuant to Federal Rule of Civil Procedure 25(d).

James R. May, James M. Stuhltrager, Edward Lloyd, South Orange, NJ, Attorneys for Plaintiffs.

Daniel M. Flores, U.S. Dept. of Justice, Environ. and Natural Resources Div., Environ. Defense Section, Washington, DC, Attorney for Defendants.

## MEMORANDUM OPINION

COOPER, District Judge.

This matter comes before the Court on (1) cross-motions for judgment on the record pursuant to Federal Rule of Civil Procedure 52(a) on Counts One and Two of the Fifth Amended Complaint, (2) cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56 on Count Four of the Fifth Amended Com-

plaint, and (3) plaintiffs' motion to strike. Plaintiffs American Littoral Society and New Jersey Public Interest Research Group, Citizens Lobby (collectively "plaintiffs") instituted this lawsuit against defendants United States Environmental Protection Agency ("EPA"), the Administrator of EPA, and the Regional Administrator of the EPA (collectively referred to herein as "EPA" or "defendants") to compel EPA to perform allegedly mandatory duties under the Clean Water Act (the "CWA"), the Endangered Species Act (the "ESA"), and the Administrative Procedures Act ("APA") in New Jersey.

Plaintiffs' CWA and APA claims allege that EPA failed to implement the CWA in New Jersey following the State of New Jersey's prolonged failure to do so. Under the CWA, the states have primary responsibility for setting water quality standards ("WQSs") pursuant to EPA regulations and taking steps to achieve those WQSs. Although the State of New Jersey ("New Jersey") set WQSs as required, it failed to take timely steps to identify water quality limited segments ("WQLSs") in New Jersey not meeting the WQSs and to establish total maximum daily loads and total maximum daily thermal loads ("TMDTLs"; total maximum daily loads and TMDTLs shall hereinafter be collectively referred to as "TMDLs") for those WQLSs. WQLS means any segment of a body of water where it is known that water quality does not meet applicable WQSs, or is not expected to meet applicable WQSs, even after application of technology-based effluent limitations. TMDLs represent the maximum amount of daily pollution a body of water can absorb before it no longer complies with a particular WQS. Under the CWA, New Jersey's obligation to identify WQLSs and establish TMDLs came due more than twenty years ago.

Count One of the Fifth Amended Complaint alleges that EPA's decisions approv-

ing New Jersey's deficient lists of WQLSs ("§ 303(d) Lists") violated section 706(2)(A) of the APA because they were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Count Two of the Fifth Amended Complaint alleges that EPA's failure to establish and implement a complete § 303(d) List and TMDLs following New Jersey's failure to do so violated section 706(1) of the APA because such failure constituted an agency action that was unreasonably delayed.

Plaintiffs' ESA claim, which is set forth in Count Four of the Fifth Amended Complaint, alleges that EPA failed to comply with section 7 of the ESA. Under section 7 of the ESA, an agency has a duty to confer with the Secretary of the Department of Commerce and the Secretary of the Department of Interior (collectively the "Secretaries")[1] when an agency action is likely to jeopardize the continued existence of any species proposed to be listed under ESA or destroy or adversely modify the critical habitat proposed to be designated for such species.

Plaintiffs seek injunctive and declaratory relief requiring EPA to establish a complete § 303(d) List for New Jersey and to implement TMDLs for the WQLSs on such list under enforceable timetables, with notice and an opportunity for comment from the public and consultation from the Secretaries.

In two lengthy prior opinions, this Court had occasion to address issues related to this longstanding litigation. In a Memorandum and Order filed on June 29, 1999, we granted in part and denied in part defendants' motion to dismiss the Second Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and granted plaintiffs leave to file a Third Amended Complaint. (Mem. & Order filed 6–29–99.) In a Memorandum Opinion filed on December 21, 2000 ("12–21–00 Memorandum Opinion"), the Court, *inter alia*, granted in part and denied in part plaintiffs' motion for summary judgment, granted in part and denied in part EPA's motion for summary judgment, and granted leave to plaintiffs to amend the Fourth Amended Complaint to correct certain defects in Count Four of the Third Amended Complaint. (Mem. Op. filed 12–21–00.)

For the reasons expressed below, the Court will (1) deny plaintiffs' motion to strike, (2) grant EPA's cross motion for judgment on the record on Counts One and Two, and (3) grant EPA summary judgment on Count Four. This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law with respect to the issues before us pursuant to Federal Rule of Civil Procedure 52(a).

## DISCUSSION

### I. STANDARDS OF REVIEW

#### A. Judgment on the Record on Counts One and Two: Federal Rule of Civil Procedure 52(a)

Pursuant to Federal Rule of Civil Procedure 52(a),[2] the parties cross move

---

1. The Secretary of the Department of Interior oversees the United States Fish and Wildlife Service, and the Secretary of the Department of Commerce oversees the National Marine Fisheries Service.

2. Rule 52(a) states:

 In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58; and in granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of its action. Requests for findings are not necessary for purposes of review. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clear-

for final judgment on the record on Counts One and Two of the Fifth Amended Complaint. Rule 52(a) allows a court to decide, with the consent of the parties, a case without a formal jury trial "based on the record compiled in summary judgment proceedings." *Acuff–Rose Music, Inc. v. Jostens, Inc.*, 155 F.3d 140, 142 (2d Cir. 1998). The Court's main concern in our 12–21–00 Memorandum Opinion was whether genuine issues of material fact precluded summary judgment. Concerning our current evaluation of Claims One and Two, however, the Court now must make findings of fact and conclusions of law with respect to the ultimate merits of those claims. In deciding the parties' cross–motions for final judgment, therefore, neither side is entitled necessarily to having all reasonable inferences made in its favor. *Natural Res. Def. Council, Inc. v. Fox*, 93 F.Supp.2d 531, 535 (S.D.N.Y. 2000) ("*NRDC III*"), aff'd in part, vacated in part, 268 F.3d 91 (2d Cir.2001).

### B. Summary Judgment on Count Four: Federal Rule of Civil Procedure 56(c)

Federal Rule of Civil Procedure 56(c) provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial burden of showing that there is no genuine issue of material fact. *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial. *Id.* at 324, 106 S.Ct. 2548. In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

"By its very terms, the standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Material facts are only those facts that might affect the outcome of the action under governing law. *Id.* at 248, 106 S.Ct. 2505; *Boyd v. Ford Motor Co.*, 948 F.2d 283, 285 (6th Cir.1991). The role of the judge at the summary judgment stage is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citation omitted).

---

ly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court. It will be sufficient if the findings of fact and conclusions of law are stated orally and recorded in open court following the close of the evidence or appear in an opinion or memorandum of decision filed by the court. Findings of fact and conclusions of law are unnecessary on decisions of motions under Rule 12 or 56 or any other motion except as provided in subdivision (c) of this rule.

## C. Review of Agency Action on Counts One, Two, and Four: Administrative Procedure Act

When reviewing agency action under the APA, "[t]he reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). Furthermore, the APA authorizes courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). "Agency action," as used in section 706, "includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).

The APA's standard of review is narrow and presumes the agency action is valid, *Ethyl Corp. v. EPA,* 541 F.2d 1, 34 (D.C.Cir.1976), but does not shield agency action from a "thorough, probing, in-depth review." *Citizens to Pres. Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The APA does not give a court power "to substitute its judgment for that of the agency," but does allow the court to "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 416, 91 S.Ct. 814.

A decision is "arbitrary and capricious" within the meaning of the APA if the agency has relied on factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

We will next address plaintiffs' motion to strike.

## II. MOTION TO STRIKE

Plaintiffs move to strike the (1) Declaration of Kathleen Callahan, (2) Declaration of Rosella O'Connor, (3) Declaration of Wayne Jackson, (4) Declaration of Robert Hargrove, (5) February 21, 2001 Letter from Robert Hargrove of the EPA to Clifford Day of the United States Fish and Wildlife Service ("FWS"), and (6) February 21, 2001 Letter from Robert Hargrove of the EPA to Mary Colligan of the National Marine Fisheries Service ("NMFS"). Plaintiffs argue that those materials are inadmissible extra–record evidence. (Pls.' Reply Br. in Supp. of Pls.' Mot. for J. on the R. for Claims 1 & 2 and in Opp'n to EPA's Cross–Mot. for J. on the R. for Claims 1 & 2 ("Pls.' JR Reply Br.") at 5, 8–10.) Specifically, plaintiffs argue that (1) those documents exceed the Court's ruling that Rule 52 motions would be limited to the "present record," (2) the Court ruled that judicial review would be limited to the administrative record, (3) the affidavits are hearsay, (4) the affidavits lack foundation and markers of reliability, and (5) principles of equity suggest that EPA should be estopped from introducing extra-record evidence. (Pls.' JR Reply Br. at 8–10.) In response, EPA argues that (1) plaintiffs failed to identify what portions of the declarations the Court should exclude, (2) the material in the declarations is responsive to the Court's inquiries in our 12–21–00 Memorandum Opinion, (3) the material in the declarations is responsive to fact-based arguments in plaintiffs' moving papers, (4) the materials provide explanations or analyses of record evidence, technical guidance, regulations, or the CWA, and (5) the materials support EPA's position that New Jersey's current efforts to comply with the CWA render judicial intervention unnecessary, which

the Court authorized EPA to offer as evidence. (EPA's Reply Mem. in Supp. of EPA's Cross Mot. for J. on the R. on Claims 1 & 2 ("EPA's JR Reply Br.") at 12 n. 4.)

Generally, judicial review of agency action is limited to review of the record on which the administrative decision was based. *Citizens to Pres. Overton Park*, 401 U.S. at 420, 91 S.Ct. 814. Certain circumstances, however, may justify expanding review beyond the record or permitting discovery. *See, e.g., Pub. Power Council v. Johnson*, 674 F.2d 791, 793 (9th Cir.1982). A court may find it necessary to review additional material to explain the basis of the agency's action and the factors the agency considered. *Friends of the Earth v. Hintz*, 800 F.2d 822, 828–29 (9th Cir.1986). When such a failure to explain agency action effectively frustrates judicial review, the court may "obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary." *Camp v. Pitts*, 411 U.S. 138, 143, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

The Court will deny plaintiffs' motion to strike. The challenged documents may be considered for several reasons. First, the Declaration of Robert Hargrove and his letters to the FWS and NMFS relate to the issue of whether plaintiffs' Claim Four is moot. Mootness, by definition, relates to "events occurring *after* the alleged violation." *S. Utah Wilderness Alliance v. Smith*, 110 F.3d 724, 729 (10th Cir.1997). The challenged documents speak to the Court's jurisdiction to hear Claim Four and are relevant to the determination of whether plaintiff has already obtained the relief it seeks. *See id.* The Court may consider those documents for purposes of determining jurisdiction under the mootness doctrine.[3] A contrary conclusion would preclude altogether an examination of mootness, which is concerned with how changed circumstances in a litigation affect a court's capacity to grant the requested relief. Therefore, the Court takes into account the Hargrove Declaration and the two letters to the respective Services.

Second, the Court's receipt of current information is essential to the proper exercise of our equitable jurisdiction. Because plaintiffs seek injunctive and declaratory relief, the Court must concern itself to some extent with events that are occurring presently. *See S.F. Baykeeper v. Browner*, 147 F.Supp.2d 991, 1001 (N.D.Cal.2001). For example, the question of "constructive submission" is at issue in the Court's consideration of plaintiffs' Claim Two. On that issue, because the Court's "only power is to require EPA to conform its present conduct to the law, EPA's past noncompliance is irrelevant to the question of an agency's *present* compliance." *NRDC III*, 93 F.Supp.2d at 536. Therefore, given that present compliance is the relevant issue, the Court should consider evidence speaking to that compliance. The Declaration of Kathleen Callahan, for example, speaks to the status of New Jersey's submission of TMDLs, which directly relates to whether a constructive submission has occurred. For that matter, it is not clear that the challenged documents even constitute materials "outside the record" on which EPA based its decisions, for the documents generally speak to events occurring since the initiation of litigation and the Court's 12–20–00 Memorandum Opinion.

---

**3.** Plaintiff submits supplemental declarations in support of their standing argument. The Court considers those declarations for the same reasons it considers EPA's documents relating to mootness—they go to the issue of the Court's jurisdiction.

Third, the Court invited and authorized the submission of the challenged documentation. In our 12–21–00 Memorandum Opinion, the Court stated that the nature and extent of EPA's duty "must be assessed in light of continuing developments, including progress in New Jersey's efforts to submit TMDLs." (12–21–00 Mem. Op. at 42.) We also stated that EPA would be "free to offer evidence 'outside the record' supporting its assertion that New Jersey's current efforts to comply with the CWA make its intervention unnecessary." (*Id.* at 48 n. 19.) EPA would be "free to challenge plaintiff's proofs on [water quality in New Jersey], or submit its own proofs, prior to the Court's final determination on the merits of plaintiffs' claim." (*Id.*) In light of those comments, it is not unreasonable for EPA to submit, and the Court to consider, supplemental materials speaking to those issues. Therefore, the Court will deny plaintiffs' motion to strike.

### III. COUNT ONE: APPROVALS

Count One of the Fifth Amended Complaint is predicated on section 303 of the CWA, which requires the establishment and implementation of WQSs. *See* 33 U.S.C. § 1313. Count One alleges that EPA's approval of allegedly deficient § 303(d) Lists of WQLSs was arbitrary, capricious, and an abuse of discretion in violation of section 706(2)(A) of the APA.[4]

Section 303(d) provides the means by which states are required to implement WQSs. Section 303(d) requires each state to identify the WQLSs within its boundaries that do not meet or are not expected to meet applicable WQSs even after the imposition of best-practicable technology-based effluent limitations and other required controls. 33 U.S.C. § 1313(d)(1). WQLS "means any segment where it is known that water quality does not meet applicable [WQSs], and/or is not expected to meet applicable [WQSs], even after the application of the technologybases [sic] effluent limitations required by sections 301(b) and 306 of the [CWA]." 40 C.F.R. § 131.3(h).

After identifying all such WQLSs, each state must establish a priority ranking for waters within its boundaries, taking into account the severity of the pollution and the uses to be made of such waters. 33 U.S.C. § 1313(d)(1)(A). The priority ranking of WQLSs is placed on the state's section 303(d) List, which is ultimately submitted to EPA for approval. 33 U.S.C. § 1313(d).

After identifying all impaired waters on its section 303(d) List, the state must also establish TMDLs for the pollutants causing impairment of each WQLS. 33 U.S.C. § 1313(d)(1)(C). As with § 303(d) Lists, the state must submit TMDLs to EPA for review. 33 U.S.C. § 1313(b)(2); 40 C.F.R. § 130.7. Any EPA-approved TMDLs must be incorporated by the state into its continuing planning processes. 33 U.S.C. § 1313(d)(2), (e). TMDLs must then be implemented through the National Pollutant Discharge Elimination System ("NPDES") permitting process to ensure attainment of WQSs.[5] 33 U.S.C. § 1311(b)(1)(C); 40 C.F.R. §§ 122.4, 122.44, and 122.62.

The Fifth Amended Complaint seeks judicial review of EPA's approval of New Jersey's 1992, 1994, 1996, and 1998 section

---

4. Section 706(2)(A) states that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

5. The NPDES is the national program for issuing, modifying, revoking and reissuing, terminating, monitoring and enforcing permits, and imposing and enforcing pretreatment requirements under the CWA. 40 C.F.R. § 122.2.

303(d) Lists submitted by New Jersey and approved by EPA to the extent that the lists omit sixty waters from the 1998 (and prior) lists.[6] Therefore, the Court will consider plaintiffs' challenge to EPA's approval of the 1992, 1994, 1996, and 1998 lists despite the omission of approximately sixty WQLSs from those lists.

Plaintiffs argue that section 303(d) Lists "must include all waters for which existing pollution controls or requirements are inadequate to provide for attainment and maintenance of water quality standards." (Pls.' Br. in Supp. of Mot. for Summ. J. ("Pls." Summ. J. Br.") at 6 (citing Guidance for 1994 Section 303(d) Lists ("1994 Guidance") at 3).) Plaintiffs argue that four categories of waters were improperly excluded from New Jersey's § 303(d) Lists: (1) CWA section 319 waters, (2) CWA section 304(l) waters, (3) waters for which CWA section 316(a) variances have been granted, and (4) waters failing to meet antidegradation standards. (Id. at 11–16.)[7]

Plaintiffs argue that EPA does not have the discretion to approve New Jersey's section 303(d) Lists when they omit such waters from the lists. EPA, on the other hand, argues that (1) plaintiffs lack standing to sue concerning the omission of waters, except for section 304(l) waters, and (2) assuming that plaintiffs have standing, the relevant administrative records support EPA's decision to approve New Jersey's 1998 (and prior) § 303(d) Lists excluding those waters. (Combined Mem. in Supp. of EPA's Cross Mot. for Summ. J.

and Br. in Opp'n to Pls.' Mot. for Summ. J. (EPA's Summ. J. Br.") at 52.)

The Court shall first address the standing issue. If the Court concludes that plaintiffs have standing, the question then becomes whether EPA's approval of New Jersey's section 303(d) Lists despite the omission of some waters from the lists, which arguably under the CWA and EPA regulations should have been on the lists, was arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law. See APA § 706(2)(A).

### A. *Standing*

EPA argues that plaintiff lack standing to challenge EPA's approvals concerning (1) section 319 waters, (2) section 316(a) waters, and (3) antidegradation waters. (EPA's Mem. in Opp'n to Pls.' Mot. for J. on the R. for Claims 1 & 2, in Opp'n to Pls.' Mot. to Enforce J., & in Supp. of EPA's Cross Mot. for J. on the R. on Claims 1 & 2 (EPA's JR Br.") at 14–15, 19–20.) Specifically, EPA argues that plaintiffs have failed to establish injury in fact.

■ For an organization to have standing, a plaintiff-member must show (1) injury in fact, an invasion of a legally protected interest that is concrete and particularized and actual or imminent, (2) a causal link between the defendant's conduct and the injury, such that the conduct is "fairly traceable" to that conduct, and (3) the likelihood that judicial relief will redress the plaintiff's injury. *Friends of*

---

6. The original Complaint alleged that 230 WQLSs were unjustifiably omitted from New Jersey's 1996 section 303(d) List. Plaintiffs' papers submitted in support of its motion for summary judgment state that EPA improperly omitted 61 WQLSs from the 1998 list. Plaintiffs reduced this number to 60 at oral argument. Plaintiffs' challenge to DEP's decision to approve the § 303(d) Lists is now moot as to those WQLSs that appear on the 1998 list.

7. In accordance with the Court's statement, the parties resubmit and rely on their briefs originally submitted for their cross-motions for summary judgment. In addressing the parties' positions, therefore, the Court shall rely on arguments raised in summary judgment briefs and judgment on the record briefs.

*the Earth v. Laidlaw Envtl. Servs., Inc.,* 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Pub. Interest Research Group of N.J., Inc. v. Magnesium Elektron, Inc.,* 123 F.3d 111, 119 (3d Cir. 1997). The parties here contest only whether the injury-infact prong is satisfied.

■■■ The United States Supreme Court has "held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetics and recreational values of the area will be lessened' by the challenged activity." *Laidlaw,* 528 U.S. at 183, 120 S.Ct. 693 (quoting *Sierra Club v. Morton,* 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)). EPA maintains that plaintiffs have failed to establish that their members use "affected areas" under *Laidlaw* because plaintiffs fail to allege that a member uses section 319 waters and fail to name any specific waters omitted from the section 303(d) list despite thermal and antidegradation concerns. (EPA's JR Br. at 14–15, 18–19.) Concerning the injury-in-fact requirement, when a plaintiff "can show that his claim to relief is free from excessive abstraction, undue attenuation, and unbridled speculation, the Constitution places no further barriers between the plaintiff and an adjudication of his rights." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,* 204 F.3d 149, 155 (4th Cir.2000).

On this standing issue, the Court finds two decisions instructive: *Alaska Center for the Environment v. Browner,* 20 F.3d 981 (9th Cir.1994), and *Sierra Club, North Star Chapter v. Browner,* 843 F.Supp. 1304 (D.Minn.1993). In *Alaska Center,* EPA argued, as it does here, that plaintiffs demonstrate injury in fact only with respect to the waters that plaintiffs can establish that they use. 20 F.3d at 985. Rejecting that argument, the court noted that the plaintiffs "established that they were adversely affected by the inadequate water quality of a representative number of waters throughout the state[.]" *Id.* Noting also that "for CWA regulatory purposes, all waters within a state are interrelated[,]" the court concluded that the plaintiffs "demonstrated actual injury sufficient to present the legal issues at issue in a concrete factual context of water pollution in Alaska as the standing requirement is meant to ensure." *Id.* (internal quotation omitted).

Similarly, in *Sierra Club, North Star Chapter,* EPA argued that the plaintiffs failed to produce "evidence of an injury in fact for waters not identified in the affidavits." 843 F.Supp. at 1309. Rejecting that contention, the court held that the plaintiffs demonstrated injury in fact because the members' affidavits indicated that they used a large number of waters throughout the state and that they have a personal stake in the quality of waters throughout the state. *Id.* at 1310.[8]

■■■ The present case is not one in which an organization's members allege

---

8. EPA's attempt to distinguish *Alaska Center* and *Sierra Club, North Star Chapter* is unavailing. (EPA's JR Reply Br. at 7–8 n. 2.) Although those cases were decided before the Supreme Court's decision in *Laidlaw,* that case effected no significant change in standing doctrine. Also, although EPA is correct in noting that the challenged action in *Alaska Center* and *Sierra Club, North Star Chapter* involved whether EPA failed to respond to a constructive submission concerning TMDLs throughout a state, the courts nonetheless focused on the statewide and programmatic nature of the section 303(d) process generally. *See Alaska Center,* 20 F.3d at 985; *Sierra Club, N. Star Chapter,* 843 F.Supp. at 1309. Therefore, the Court finds those decisions instructive concerning the standing issue in the context of the section 303(d) process in this case.

stigmatic injury in the form of members' mere knowledge that waters are polluted. *See Pub. Interest Research Group of N.J., Inc.*, 123 F.3d at 120–21. As in *Alaska Center* and *Sierra Club, North Star Chapter*, plaintiffs here have submitted numerous affidavits in which the affiants attest to their use of section 303(d) waters and that they are injured by EPA's conduct. (*See, e.g.*, Aff. of Andrew J. Willner ¶¶ 4, 12 (stating that he uses Hudson/Raritan Estuary and tributaries for fishing, birdwatching, and educational purposes and that pollution causes bad odors, "makes it uncomfortable to swim," and causes disappearance of "eel grass" in estuary); Aff. of Maureen Goodsir ¶ 11 (stating that many ponds and lakes near house in Rampo River watershed "literally stink"); Aff. of Sheldon M. Abrams ¶¶ 6,7 (stating that he uses Sandy Hook Bay, Arthur Kill, Navesink River, Raritan Bay, and Atlantic Ocean and that observes while scuba diving effects of pollution on marine life and periodically dead and diseased marine life); Aff. of Eleanor Ann Vine ¶¶ 4,6,8 (stating that she uses Cooper River and Newton Creek for walking, biking, canoeing, birdwatching, and aesthetic enjoyment and has observed garbage, fishkills, and algae blooms).) The Court concludes, therefore, that plaintiffs have demonstrated the injury-in-fact element of standing.[9]

We will now discuss plaintiffs' claims with respect to each of the four challenged categories of waters.

**9.** The parties do not address the "fairly traceable" and "redressibility" prongs of the standing inquiry, but the Court concludes that those elements are satisfied as well. The "fairly traceable" element ensures that a genuine nexus exists between a plaintiff's injury and a defendant's alleged illegal conduct. *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130. The "redressibility" element ensures that the alleged injury can be remedied by judicial relief. *Warth v. Seldin*, 422 U.S. 490, 508, 95

### B. *Section 319 Waters*

Section 319 of the CWA requires states to prepare and submit to EPA for approval a report (the " § 319 List") identifying waters (" § 319 Waters") within the state that are water quality limited, i.e., waters that are known not to meet applicable WQSs, or cannot reasonably be expected to attain or maintain such standards, without additional action to control nonpoint sources of pollution. *See* 33 U.S.C. § 1329(a)(1).

EPA regulations require that each state "assemble and evaluate all existing and readily available water quality-related data and information" to develop its section 303(d) Lists. 40 C.F.R. § 130.7(b)(5). At a minimum, "all existing and readily available water quality-related data and information" includes "all of the existing and readily available data and information about ... [w]aters identified by the [s]tate as impaired or threatened in a [§ 319 List] or in any updates of the [list]." 40 C.F.R. § 130.7(b)(5)(iv). Thus, it appears that EPA regulations require states to include waters on their section 303(d) Lists that were identified as impaired or threatened on their § 319 Lists.

If a state chooses not to include a WQLS from its § 319 List on its section 303(d) List, it must provide EPA with documentation to support its decision. 40 C.F.R. § 130.7. This documentation must at a minimum include:

S.Ct. 2197, 45 L.Ed.2d 343 (1975). Here, the injuries alleged are linked to EPA's alleged failure to follow section 303(d), which requires EPA to oversee a comprehensive evaluation of a state's waters and development of TMDLs to improve water quality in WQLSs, and the inclusion of impaired waters could redress the injuries. *See Sierra Club, N. Star Chapter*, 843 F.Supp. at 1311 (finding "fairly traceable" and "redressibility" elements satisfied).

(i) A description of the methodology used to develop the [§ 303(d) List]; and

(ii) A description of the data and information used to identify waters, including a description of the data and information used by the State as required by § 130.7(b)(5); and

(iii) A rationale for any decision to not use any existing and readily available data and information for any one of the categories of waters as described in § 130.7(b)(5); and

(iv) Any other reasonable information requested by [EPA]. Upon request by [EPA], each State must demonstrate good cause for not including a water or waters on the list. Good cause includes, but is not limited to, more recent or accurate data; more sophisticated water quality modeling; flaws in the original analysis that led to the water being listed in the categories in § 130.7(b)(5); or changes in conditions, e.g., new control equipment, or elimination of discharges.

40 C.F.R. § 130.7(b)(6).

■ New Jersey submitted its § 319 List to EPA in 1989. (Decl. of Felix Locicero dated 3–13–00 ("Locicero Decl.") Ex. D–1: State of N.J. Nonpoint Assessment and Mgmt. Program dated October 1989 app. B.) The § 319 List is entitled "Preliminary List of Waterways Suspected of Being Impacted by Nonpoint Source Pollution." (*Id.*) An introduction to the list states:

Rivers and streams that without additional action to control nonpoint sources of pollution, cannot be expected to attain or maintain standards. Categories of nonpoint sources which add significant pollution to the listed waterbodies are provided. Pollution sources are limited to those reported to us as having a moderate to severe impact upon the receiving waterway. Pollution categories listed are most often suspected and pre-

liminary and are not based upon monitored data.

(*Id.*) New Jersey's § 319 List is marked "Final Submittal 12–2–89." (*See* Decl. of Felix Locicero filed 5–15–00 Ex. D–1.)

EPA asserts that its decision to approve New Jersey's section 303(d) Lists despite their omission of twenty-five § 319 Waters was not arbitrary or capricious. (EPA's JR Br. at 16–19; EPA's JR Reply Br. at 11–12; EPA Summ. J. Br. at 51–57.) EPA maintains that New Jersey was not required to include all WQLSs appearing on its § 319 List on its § 303(d) Lists because (1) the § 319 List was only a "preliminary" list, not based on any monitored data and identified waters only "suspected" of being impaired by nonpoint sources of pollution (EPA Summ. J. Br. at 53, 56); (2) New Jersey does not use its § 319 List as a primary data source for its § 303(d) Lists, but rather uses the underlying data, which New Jersey claims does not support the listing of all § 319 Waters on its § 303(d) Lists (*id.* at 54 55); (3) certain waters appearing on the § 319 Lists may be slightly impacted but were not considered water quality limited by New Jersey (*id.* at 54); and (4) the fact that some § 319 Waters were included on New Jersey's section 303(d) Lists supports the conclusion that New Jersey considered all existing and readily available data and information when formulating its section 303(d) Lists (*id.* at 55–57.)

Plaintiffs argue that EPA's decisions to approve New Jersey's section 303(d) Lists despite omission of twenty-five waters appearing on New Jersey's § 319 List were arbitrary and capricious, an abuse of discretion, and contrary to law in violation of section 706(2)(A) of the APA. (*See, e.g.,* Pls.' Summ. J. Br. at 12–13, 18.) Plaintiffs respond to EPA's allegations by arguing that (1) the fact that some of New Jersey's § 319 Waters were on its § 303(d) Lists

was coincidental at best (*id.* at 8), (2) the § 319 List was not preliminary because New Jersey submitted and EPA approved and treated the § 319 List as final (*id.* at 8–9), and (3) EPA's belief that exclusion of twenty-five § 319 Waters from New Jersey's § 303(d) Lists was proper is not supported by the record because no documentation was submitted by New Jersey to EPA to show that the waters were not really impaired (*id.* at 9–10).

In our 12–21–00 Memorandum Opinion, the Court indicated that "a later finding by New Jersey that the § 319 Waters are not impaired would appear to require submission of documentation to EPA demonstrating good cause for omission of the non-listed waters." (12–21–00 Mem. Op. at 22 (citing 40 C.F.R. § 130.7).) We also stated that "if New Jersey's explanation that its § 319 List included waters that were not water quality limited demonstrated good cause for not relying on the list as a primary source of data, then EPA's decision to approve New Jersey's § 303(d) Lists despite the omission of twenty-five § 319 Waters would not be arbitrary, capricious, an abuse of discretion, or contrary to federal law." (*Id.*)

The Court concludes that EPA's approval of New Jersey's section 303(d) Lists despite the omission of twenty-five section 319 Waters was not arbitrary and capricious. That conclusion is consistent with regulations requiring a state omitting a § 319 Water to provide EPA with a "rationale" for the omission. *See* 40 C.F.R. § 130.7(b)(6)(iii). New Jersey based its omission on factors identified in regulation. Specifically, those factors included "more recent or more accurate data; more sophisticated water quality modeling; [or] flaws in the original analysis that led to the water being listed" on the § 319 Lists. 40 C.F.R. § 130.7(b)(6)(iv). The § 319 List that New Jersey submitted in 1989 was preliminary, and an introduction to

the list states that the "[p]ollution categories listed are most often suspected and preliminary and are not based on monitored data." (Locicero Decl. Ex. D–1 app. B.) As part of a wider evaluation of nonpoint source waters, the State used the 319 Report in conjunction with other sources to develop its section 303(d) Lists. (Decl. of Rosella T. O'Connor dated 7–11–01 ("O'Connor Decl.") ¶ 8.)

New Jersey explained that primary reliance was placed on "quality assured data" acquired during its full evaluation and that sole reliance was not on the 319 Report, which was based mainly on unmonitored information, for purposes of listing waters affected by nonpoint source discharges under section 303(d). (*See, e.g.,* Locicero Decl. Ex. C–13: New Jersey's Response to Comments at 6 (indicating that New Jersey's 319 Nonpoint Assessment and Management Program "is not used as a primary source of date to delineate WQLSs.... However, when segments are determined to be water quality limited, using quality assured data generated under the 319 grant program, they are included in this list").) New Jersey's quality assured data included several types of monitoring data and macroinvertebrate assessment data. (Locicero Decl. Ex. D–21 at 4 (informing EPA that "all available information was used in the listing process, including ambient water quality; source and loading data; macroinvertebrate assessment data; shellfish growing water classification monitoring data; and fish tissue data").) The State informed EPA that the omission of a water identified in the 319(a) Report from the 303(d) Lists was based on a subsequent determination that such a water was not water quality limited, although perhaps slightly affected by a nonpoint source discharge. (*Id.*) Because New Jersey indicated to EPA that "when segments are determined to be water quality limited, using quality assured data gen-

erated under the section 319 grant program, they are included in the 303(d) list" (Locicero Decl. Ex. C–17 at 3), EPA concluded that New Jersey had addressed satisfactorily any concerns that the State was disregarding section 319 related information. The result of New Jersey's subsequent evaluation of § 319 Waters was the inclusion of more than ninety such waters on the section 303(d) List and the exclusion of approximately fifty others, including the twenty-five waters about which plaintiff's complain. (O'Connor Decl. ¶ 7.) Although the lack of monitoring supporting a section 319 listing is insufficient reason to omit § 319 waters from the section 303(d) List (12–21–00 Mem. Op. at 21 n. 9), New Jersey provided good cause for its omissions based on the supplementation of preliminary information with subsequent intensive data. Thus, the Court finds that EPA's decision to approve New Jersey's section 303(d) Lists despite omission of twenty-five § 319 Waters was not arbitrary and capricious because New Jersey demonstrated good cause for its omissions.

### C. *Section 304(l) Waters*

Section 304(*l*) of the CWA requires states to prepare and submit to EPA for approval a list (" § 304(*l*) List") identifying waters (" § 304(*l*) Waters") within the state that cannot reasonably be anticipated to attain or maintain WQSs due to toxic pollutants, to identify point source dischargers of these pollutants, and to develop individual control strategies for these dischargers. 33 U.S.C. § 1314(*l*). § 304(*l*) Waters must be included on a state's section 303(d) Lists.[10] *See* Guidance for Water Quality Based Decisions: The TMDL Process ("TMDL Guidance") at 45 ("When developing [a § 303(d) List] a state should,

at a minimum, use [ ] waters listed under section 304(*l*).").

Plaintiffs claim that EPA's approval of New Jersey's section 303(d) Lists despite omission of thirty § 304(*l*) Waters from the lists was arbitrary and capricious, an abuse of discretion, and contrary to law in violation of section 706(2)(A) of the APA. (Pl.'s Summ. J. Br. at 6.) Under the arbitrary and capricious standard of review, "a reviewing court may not set aside an agency [action] that is rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by statute." *See Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 42–43, 103 S.Ct. 2856. An agency is required to examine the relevant evidence and articulate a satisfactory explanation for its action. *See id.* at 43, 103 S.Ct. 2856. Agency action will be deemed arbitrary and capricious if the evidence proves that the agency failed to consider an important aspect of the problem. *See id.*

EPA argues that the thirty waters were justifiably omitted from New Jersey's section 303(d) Lists because the waters appeared only on preliminary drafts of New Jersey's § 304(*l*) List that were never approved, and the waters did not appear on New Jersey's final § 304(*l*) List, which was approved. (EPA's JR Br. at 22–25; EPA's Summ. J. Br. at 57–60.) Although EPA did not list New Jersey's "final" § 304(*l*) List in the administrative record or produce it during the course of discovery, EPA amended the index to the administrative record in response to plaintiffs' motion for summary judgment and cites references in the record to the "final" § 304(*l*) List.

---

**10.** EPA does not deny that § 304(*l*) Waters must be included on a state's section 303(d) Lists. (*See* EPA's Summ. J. Br. at 57–60.)

At the summary judgment stage, we noted that "if New Jersey's § 303(d) Lists omitted those thirty waters because the waters appeared only on preliminary drafts of New Jersey's § 304(l) List that were never approved, and not on New Jersey's final § 304(l) List, which was approved, then EPA's decision to approve New Jersey's section 303(d) Lists despite omission of the thirty remaining § 304(l) Waters would not be arbitrary and capricious." (12–21–00 Mem. Op. at 27.) Because the Court finds that the disputed waters do not appear on New Jersey's final § 304(l) Lists, we now conclude that EPA's decision to approve the State's section 303(d) Lists despite the omission of thirty section 304(l) Waters was not arbitrary and capricious.

The parties' dispute concerning § 304(l) Waters centers on the relative significance of "mini" and "short" lists, on the one hand, and the "long" list, on the other. Section 304(l) Lists in the states emanate from several preliminary lists: (1) the "mini" lists of waterbodies under section 304(l)(A)(I) that the states did not expect to achieve water quality standards ("WQSs") due to discharges of toxic pollutants from point or nonpoint sources; (2) the "short" lists of waterbodies under section 304(l)(b) that the states did not expect to achieve WQSs due to discharges of toxic pollutants from only point sources; and (3) the "long" lists of waterbodies under section 304(l)(A)(ii) that the states did not expect to achieve WQSs due to almost any impairment from point or nonpoint sources.

In February 1989, New Jersey submitted to EPA a report entitled "Development of the Final 304(l) Short List," which contained New Jersey's short and mini lists. (Decl. of Melaine A. Williams, Esq., dated 3–13–00 Ex. T.) Following public notice and comment, EPA approved that list. (58 Fed.Reg. 58,548 (Nov. 2, 1993); Decl. of Wayne F. Jackson dated 7–6–01 ("Jackson Decl.") ¶¶ 11–13.) A comparison of New Jersey's final short and mini lists and plaintiffs' § 304(l) List reveals that none of the thirty-five waters about which plaintiffs originally complained are on the State's final short or mini lists of waters impaired by toxic pollutants, with the exception of five omitted waters and the Signac River.[11] The short and mini lists are the two final lists required by section 304(l) that deal exclusively with waters impaired by toxic pollutants. (Jackson Decl. ¶ 7.) The long list is a broader list identifying waterbodies not expected to achieve water quality standards due to virtually any impairment from nonpoint or point sources. (Id.) Insofar as waters listed under section 304(l) due to toxic impairment are concerned, the long list merely duplicates the final short and mini lists. (Id.) Because the record indicates that the waters identified by plaintiffs were not on New Jersey's final § 304(l) lists of water impaired by toxic pollutants, the Court concludes that EPA did not act arbitrary or capriciously in approving New Jersey's section 303(d) List despite the omission of thirty remaining 304(l) Waters.

11. In our 12–21–00 Memorandum Opinion, we granted summary judgment to plaintiffs on five § 304(l) Waters inadvertently omitted from New Jersey's section 303(d) List. (12–21–00 Mem. Op. at 24–25.) Consistent with the Court's Orders, EPA is in the process of publishing a Federal Register notice listing those five waters. (O'Connor Decl. ¶ 6.) Defendants also indicated that in comparing New Jersey's 1998 section 303(d) List to the State's final short and mini lists, they discovered that the Signac River was not included on the section 303(d) List for toxics, despite its appearance on the New Jersey's final mini list. (EPA's JR Br. at 25 n. 16.) EPA represents that it is correcting that defect. (Id.)

## D. *Section 316(a) Waters*

Section 301(a) of the CWA provides that the discharge of any pollutant shall be unlawful unless otherwise authorized by the CWA. 33 U.S.C. § 1311(a). Section 303(d) of the CWA requires states to identify those waters or parts thereof within its boundaries for which controls on thermal discharges under section 301 are not stringent enough to assure protection and propagation of a balanced and indigenous population of shellfish, fish, and wildlife. 33 U.S.C. § 1313(d)(1)(B).

Section 316(a) of the CWA and New Jersey's water quality regulations allow for point source dischargers to receive a variance from the requirements of section 301 if the dischargers can show that any effluent limitation proposed for the control of the thermal component of any discharge from such source will require effluent limitations more stringent than necessary to assure the protection and propagation of a balanced, indigenous population of shellfish, fish, and wildlife in and on the body of water into which the discharge is made. *See* 33 U.S.C. § 1326(a); N.J. Admin. Code tit. 7, § 14A–11.7. Any such variance must assure the protection and propagation of a balanced, indigenous population of shellfish, fish, and wildlife in and on that body of water. *See* 33 U.S.C. § 1326(a); N.J. Admin. Code tit. 7, § 14A–11.7.

■ Plaintiffs claim that waters subject to a thermal variance do not meet WQSs. (Pls.' Summ. J. Br. at 16.) Plaintiffs argue that waters that do not meet thermal WQSs because of the presence of a point-source discharger (subject to a variance) must be included on a state's section 303(d) Lists. (*Id.* at 7, 16.) Plaintiffs claim that EPA's approval of New Jersey's section 303(d) Lists despite the omission of an undisclosed number of § 316(a) Waters from the lists was arbitrary and capricious, an abuse of discretion, and contrary to law

in violation of section 706(2)(A) of the APA. (*Id.* at 16, 18.)

EPA argues that plaintiffs' claims based on section 316(a) must fail because (1) they did not identify any waters that are impaired as a result of New Jersey's grant of a section 316(a) variance (EPA's Summ. J. Br. at 62) and (2) "New Jersey responded to Plaintiffs' 1998 list 316(a) comments by observing that 'if data indicates that the receiving waters have in fact been impaired, the Department [New Jersey] has the option to deny the renewal of the variance. Such mechanisms make listing in section 303(d) unnecessary as a direct feedback loop exists to monitor for and if necessary address any thermal pollution brought about by section 316(a) variances.' Under the circumstances, EPA does not believe it was arbitrary and capricious to have approved New Jersey's 1998 (and pre 1998) lists." (*Id.* at 62 n. 45 (quoting Locicero Decl. Ex. B–28 at 10) (verbatim).)

In reply, plaintiffs argue that (1) there is "readily available" information from which to identify waters that are impaired as a result of New Jersey's grant of section 316(a) variances, (2) it is the duty of the State, not the public, to identify such impaired waters, and (3) the CWA does not provide an exemption to section 303(d)'s listing requirement for waters subject to a section 316(a) variance because of other "feedback loops." (Pls.' Summ. J. Reply Br. at 13–14 & n. 13.)

The Court finds that plaintiffs' claim has no basis. EPA's approval of New Jersey's § 303(d) Lists despite omission of WQLSs subject to § 316(a) variances was not arbitrary and capricious. As we stated in our 12–21–00 Memorandum Opinion (12–21–00 Mem. Op. at 30), "[a] state is only required to list WQLSs for which controls on thermal discharges are not stringent enough to assure protection and propagation of a balanced and indigenous population of shell-

fish, fish, and wildlife." *See* 33 U.S.C. § 1313(d)(1)(B); 40 C.F.R. § 130.7(b)(2). A § 316(a) variance must assure the protection and propagation of a balanced, indigenous population of shellfish, fish, and wildlife in and on that body of water. *See* 33 U.S.C. § 1326(a). Therefore, WQLSs subject to § 316(a) variances should not be water quality limited, and plaintiffs have failed to identify any § 316(a) Waters that are impaired or threatened by thermal discharges. New Jersey has issued only three thermal variances, and no resulting impairment of the receiving waters has occurred. (O'Connor Decl. ¶ 5.) Therefore, EPA's decision to approve New Jersey's section 303(d) Lists despite omission of § 316(a) Waters was not arbitrary or capricious.

### E. *Antidegradation Waters*

Federal antidegradation requirements found at 40 C.F.R. § 131.12 require states to develop, adopt, and implement a statewide antidegradation policy. Antidegradation standards ensure that the level of water quality needed to protect existing uses is maintained and that water quality better than necessary to protect existing uses shall be maintained and protected unless lower water quality is necessary to accommodate important economic or social development in the area. 40 C.F.R. § 131.12. New Jersey's antidegradation policy is found at N.J. Admin. Code tit. 7, § 9B 1.5(d). A state is required to include waters that fail to meet CWA's antidegradation standards ("Antidegradation Waters") on its section 303(d) Lists. *See* 40 C.F.R. § 130.7(b)(3) ("For the purposes of listing waters [states must include waters that fail to meet WQSs] established under section 303 of the [CWA], including numeric criteria, narrative criteria, waterbody uses, and antidegradation requirements."); *see also* 40 C.F.R. § 131.6(d) (requiring state's WQSs to include an antidegradation policy consistent with 40 C.F.R. § 131.12).

Plaintiffs claim that EPA's approval of New Jersey's section 303(d) Lists despite omission of an undisclosed number of Antidegradation Waters from the lists was arbitrary and capricious, an abuse of discretion, and contrary to law in violation of section 706(2)(A) of the APA. (Pls.' Summ. J. Br. at 16–18; Pls.' Summ. J. Reply Br. at 16–17.) EPA argues that plaintiffs' claims based on New Jersey's failure to identify any Antidegradation Waters on its § 303(d) Lists must fail because plaintiffs did not identify any Antidegradation Waters that were improperly omitted. (EPA's Summ. J. Br. at 64.).

Plaintiffs have not identified whether New Jersey has any Antidegradation Waters requiring protection. If New Jersey has no such waters whose high quality is threatened, or if alternative controls ensure that those waters will attain New Jersey's antidegradation standards in the near future, then EPA's approval of New Jersey's § 303(d) Lists would not be arbitrary or capricious. In *Sierra Club v. United States Environmental Protection Agency,* 162 F.Supp.2d 406 (D.Md.2001), the plaintiffs alleged that Maryland's 1996 and 1998 section 303(d) lists failed to include thermal-variance waters and antidegradation waters. In rejecting that claim, the court stated:

> Plaintiffs fail to identify any such impaired water, nor do they identify any available data that contains such information that Maryland did not consider. Because EPA's decision is presumed valid and Plaintiffs bear the burden of overcoming this presumption, Plaintiff's failure to provide any evidence to support their position provides no basis upon which the Court could find that EPA's approval was arbitrary and capricious, or an abuse of discretion.

*Id.* at 416. We agree with that reasoning and conclude that EPA's actions were not

arbitrary and capricious with regard to the Antidegradation Waters.

## IV. COUNT TWO: CONSTRUCTIVE SUBMISSION & UNREASONABLE DELAY

Count Two of the Fifth Amended Complaint is predicated on EPA's alleged failure to implement New Jersey's TMDL program over the last twenty years after New Jersey failed to do so. Plaintiffs allege that EPA's failure constitutes an unreasonable delay of agency action in violation of section 706(1) of the APA.[12]

Congress passed the CWA in 1972. Section 303(d) established the TMDL program, which required states to identify impaired waters and create TMDLs for pollutants that were impairing the waters. States were required to submit initial 303(d) Lists and accompanying TMDLs to EPA within 180 days of EPA's 1978 identification of pollutants suitable for TMDL calculation. 33 U.S.C. § 1313(d)(2); 43 Fed.Reg. 60,662, 60,666 (Dec. 28, 1978); *Scott v. City of Hammond,* 741 F.2d 992, 996 n. 10 (7th Cir.1984). Thereafter states were required to submit section 303(d) Lists and TMDLs to EPA for review and approval "from time to time." 33 U.S.C. § 1313(d)(2). Since 1992, EPA has required states to submit section 303(d) Lists and TMDLs by April 1 in every even numbered year.[13] *See id.; see also* 40 C.F.R. § 130.7(d)(1); 57 Fed.Reg. 33,040, 33,050 (July 24, 1992). In practice, however, many states, including New Jersey, resisted the TMDL mandate. Diane K. Conway, *TMDL Litigation: So Now What?,* 17 Va. Envtl. L.J. 83, 90 (1997).

EPA must approve or disapprove a state's section 303(d) List or TMDL within thirty days of its submission. *Id.* If EPA disapproves a § 303(d) List, it must identify the WQLSs that should be on the list within thirty days from the date of disapproval. *Id.* Similarly, if EPA disapproves a TMDL, it must establish the TMDL, within thirty days from the date of disapproval. *Id.* Conspicuously absent from the language of the statute is what, if any, duty EPA has where a state fails to submit § 303(d) Lists and TMDLs to EPA for review as required.

The courts began to determine that at some point, states would be deemed to have constructively submitted a defective § 303(d) List and TMDLs, requiring EPA to disapprove such list and TMDLs and step into the shoes of the states and establish lists within thirty days of such disapproval. *See, e.g., Natural Res. Def. Council v. Fox,* 909 F.Supp. 153, 156–58 (S.D.N.Y.1995).

 Plaintiffs filed this lawsuit against EPA in 1996 to enforce the TMDL program in New Jersey. Count Two of the Fifth Amended Complaint alleges that "EPA's failure to disapprove New Jersey's submission of no TMDLs ... and to establish TMDLs ... for all New Jersey WQLSs, constitute[s] the unreasonable delay of agency action." (Compl.¶ 78.) Plaintiffs seek to compel EPA to carry out the actions that were unreasonably delayed, namely the disapproval of New Jersey's constructive submission of no TMDLs and the establishment of TMDLs

---

**12.** Section 706(1) of the APA states that a reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

**13.** On March 31, 2000, EPA promulgated a Final Rule, which removed the requirement of the states to submit § 303(d) Lists and TMDLs to EPA in 2000 unless a state is re-

quired to do so by court order. 65 Fed.Reg. 17,166 (Mar. 31, 2000). On July 11, 2000, EPA promulgated a Final Rule changing the frequency with which TMDLs are to be submitted to EPA for review and approval. Beginning in 2002, TMDLs need only be submitted every four years. 65 Fed.Reg. 43,586 (July 13, 2000).

for waters appearing on New Jersey's current § 303(d) List.

For plaintiffs to show that EPA's actions under section 303(d) have been unreasonably delayed pursuant to section 706(1) of the APA, plaintiffs must first show that New Jersey constructively submitted defective TMDLS. As we held in our June 29, 1999 decision, EPA's decision concerning when to step into the shoes of a state and establish TMDLs in the face of inaction by that state is discretionary. (Mem. & Order filed 6–29–99 at 8.) We also held, however, that EPA's discretion as to when to deem state inaction a "constructive submission" is not unfettered. (*Id.* at 12.)

The triggering conduct forming the basis of plaintiffs' unreasonable delay claim against EPA is New Jersey's failure to comply with CWA requirements to establish TMDLs. EPA was aware of the states' obligations to comply with such requirements and of New Jersey's failure to comply. *See* 33 U.S.C. § 1313(d)(2). Thus, a state's inaction in carrying out the state's obligations under the CWA can form the predicate act (or in this case inaction) by which any unreasonable delay claim against EPA may be measured.

 In addressing the factors relevant to the Court's consideration of this issue, the Court must be mindful of the remedies available to plaintiffs should they be successful in proving their claim. The Court's power in this context is limited to compelling agency action that has been unreasonably delayed. *See NRDC III*, 93 F.Supp.2d at 531. Although evidence of the long history of the failure of EPA and New Jersey to perform their duties under the CWA is relevant to the reliability of these entities' promises of future compliance, such evidence is not dispositive. *See id.* As the Court's sole power in this context is to require EPA to conform its present conduct to the law, EPA's past noncompliance is irrelevant to the question of the agency's present compliance, and to whether the Court will compel EPA to act in a particular manner. *See id.* Even if EPA's duty to intervene has been triggered, the nature and extent of that duty. must be assessed in light of continuing developments, including progress in New Jersey's efforts to submit TMDLs. *See id.* Sufficient progress by New Jersey, even after a period of delinquency, can reduce the extent of EPA intervention required or even render moot the need for any intervention. *See id.* Thus, the issue can be decided by answering two questions: (1) was EPA's refusal to recognize New Jersey's failure to submit TMDLs as a "constructive submission" of defective TMDLs arbitrary, capricious, or an abuse of discretion; and if so, (2) is EPA's delay in taking steps to develop TMDLs unreasonable in light of the present circumstances.

As to the first question, EPA argues that it did not abuse its discretion in refusing to recognize New Jersey's failure to submit TMDLs as a "constructive submission" of defective TMDLs. New Jersey submitted four TMDLs in 1987, which EPA approved. In addition, New Jersey began taking active steps in 1994 toward complying with its obligations under section 303(d) of the CWA. For example, in 1994, New Jersey cooperated with EPA and the New York State Department of Environmental Conservation in the preparation of TMDLs for copper, mercury, nickel, and lead in the N.Y. NJ Harbor. (Administrative Record for EPA's Decision Not to Undertake Establishment of TMDLs for New Jersey ("Admin.R.") # 12; Locicero Decl. Ex. A–58 at 12.) In 1996, New Jersey prepared a proposed Comprehensive Water Resources Management Program Rule. (Admin.R. # 16.) In 1997, New Jersey and EPA prepared a performance partnership agreement, presumably outlining New Jersey's commitment to fulfilling its section 303(d) obli-

gations. (*Id.* # 23.) Also in 1997, New Jersey prepared a draft Statewide Watershed Management Framework Document for New Jersey. (*Id.* # 24.) Drafts of a Memorandum of Agreement ("MOA") were prepared by New Jersey and EPA in 1998 dealing with New Jersey's commitment to fulfill New Jersey's TMDL obligations. (*Id.* # 30, 32, 34, 39, 40.) A final MOA was signed in 1999. (Locicero Decl. Ex. A–58.) Finally, New Jersey began submitting TMDLs to EPA for approval pursuant to the MOA. (*Id.* Ex. H–3 to H–7, I.)

 The question is whether that action (or relative inaction) constitutes a constructive submission. The constructive submission doctrine is an exercise in judicial lawmaking, existing only by judicial gloss on the CWA. *NRDC III*, 93 F.Supp.2d at 537 n. 3, 542. The intent behind that judicially created doctrine "is to ensure that EPA will ultimately bear a mandatory duty to act in furtherance of the goals of the CWA if a state refuses to act." *Id.* at 542.

 The doctrine of constructive submission "is necessarily a narrow" doctrine, applying "only when a state's actions clearly and unambiguously express a decision to submit *no* TMDL for a particular impaired waterbody." *Hayes v. Whitman*, 264 F.3d 1017, 1024 (10th Cir.2001) (emphasis added). A constructive submission occurs "only if the state fails to submit any TMDLs *and* has no plan to remedy the situation." *S.F. Baykeeper*, 147 F.Supp.2d at 1001. Therefore, the standard for constructive submission is stringent, requiring both that a state submit *no* TMDLs *and* have *no* plan to remedy that total failure. For a constructive submission to be deemed to have occurred, it must be demonstrated that a state "entirely failed" to act *Hayes v. Browner*, 117 F.Supp.2d 1182, 1194 (N.D.Okla.2000), *aff'd*, 264 F.3d 1017 (10th Cir.2001), or has "flatly chosen not to act." *Sierra Club v. United States Envtl.*

*Prot. Agency*, 162 F.Supp.2d 406, 418 n. 18 (D.Md.2001).

 When "a state has submitted or soon plans to submit TMDLs for its impaired waters, the constructive-submission analysis would be factually inapplicable." *Hayes*, 264 F.3d at 1023. That principle is illustrated in a number of recent federal decisions. In *Sierra Club v. United States Environmental Protection Agency*, the district court held that the constructive submission doctrine was inapplicable because Maryland had made several TMDL submissions. 162 F.Supp.2d at 418 n. 18. In *Hayes v. Whitman*, the Tenth Circuit held inapplicable the constructive submission doctrine because EPA produced evidence "that Oklahoma ha[d] in fact submitted (and the EPA ha[d] approved) a small number of TMDLs and ha[d] a schedule to develop many more TMDLs over the next twelve years." 264 F.3d at 1020. In *Idaho Sportsmen's Coalition v. Browner*, the district court concluded that no constructive submission had yet occurred, even though Idaho had submitted only three TMDLs and its schedule for future submissions was inadequate. 951 F.Supp. 962, 968 (W.D.Wash.1996). The doctrine was inapplicable also in *Sierra Club, North Star Chapter v. Browner* because forty-three TMDLs had been submitted and approved. 843 F.Supp. 1304, 1313(D.Minn.1993).

Defendants argue that the recent decision in *San Francisco Baykeeper, Inc. v. Browner*, 147 F.Supp.2d 991 (N.D.Cal. 2001), is particularly on point (EPA's JR Br. at 4–6; EPA JR Reply Br. at 4–6), and the Court agrees. In that case, as in this one, plaintiff contended that a state had constructively submitted TMDLs through its failure to act. *S.F. Baykeeper*, 147 F.Supp.2d at 999. The issue was whether the court should exercise its equitable power to compel EPA to take action when

(1) California had submitted some TMDLs, (2) EPA had taken some action, although allegedly inadequate, on those submissions, and (3) EPA was taking steps with California to bring that state's TMDL program into compliance with the CWA. *Id.* The court summarized its position:

> [T]his court finds and concludes that California and the EPA have both been doing something about TMDLs, albeit not as rapidly as contemplated by the passage of the CWA. But in the view of the record, this court cannot find that there have been *no* filing by California and *no* actions by the EPA. The record does not support plaintiffs' contention that there has been a constructive submission of no TMDLs. . . . Although the EPA has not acted with speed or on the timetable which Congress envisioned, it has acted with sufficient diligence that this court's interference with an injunctive remedy is not appropriate.

*Id.* at 1002 (emphasis added).

Plaintiffs argue that *San Francisco Baykeeper* is distinguishable because California had a "vibrant" program developing a "substantial number" of TMDLs, whereas New Jersey's development has been nearly nonexistent. (Pls.' JR Reply Br. at 22–23.) The standard set out in *San Francisco Baykeeper*, however, is clear: A constructive submission "occurs only if the state fails to submit any TMDLs *and* has no plan to remedy the situation." 147 F.Supp.2d at 1001. Therefore, the fact that California submitted *more* TMDLs than has New Jersey is not decisive. What matters is that both states submitted *some* TMDLs and have plans to remedy past failures, which means that no constructive submission has occurred under the relevant standard. The record here, as in *San Francisco Baykeeper*, "establishes that this is not a case of a total failure to act, by either the state or the EPA." *Id.* at 1000. As recounted above, New Jersey submitted four TMDLs in 1987, which EPA approved. New Jersey began taking active steps in 1994 toward complying with its obligation under section 303(d) of the CWA. In 1996, New Jersey prepared a proposed Comprehensive Water Resources Management Program Rule. In 1997, New Jersey and EPA prepared a performance partnership agreement, presumably outlining New Jersey's commitment to fulfilling its section 303(d) obligations. Also in 1997, New Jersey prepared a draft Statewide Watershed Management Framework Document for New Jersey. Drafts of the MOA were prepared by New Jersey and EPA in 1998 dealing with New Jersey's commitment to fulfill New Jersey's TMDL obligations. A final MOA was signed in 1999. Finally, New Jersey began submitting TMDLs to EPA for approval pursuant to the MOA. In light of those developments, it cannot be concluded that the relevant standard is satisfied, namely, that New Jersey has submitted no TMDLs and has no plans to do so. The district court in *NRDC III* depicted a similar set of circumstances:

> [T]o date, while New York has not promulgated TMDLs for every waterbody on its most recent § 303(d) list, it has unquestionably formulated and submitted *some* TMDLs, and has dedicated substantial resources to the problem and amply demonstrated its good-faith interest in collaborating with EPA to bring the State's TMDL program to completion. On this basis alone, the Court can conclude that EPA's decision not to declare a "constructive submission" of "no TMDLs" by New York is well-supported by the record.

93 F.Supp.2d at 540. New Jersey has evidenced sufficient indicia of compliance, and the record indicates that EPA's decision not to declare a "constructive submission" of no TMDLs by New Jersey was not arbitrary, capricious, or unreasonable.

The record further indicates that compliance is presently improving. EPA's intervention is not necessary in light of New Jersey's current efforts to further comply with its TMDL obligations. New Jersey is working with EPA toward compliance with New Jersey's TMDL requirements. During the past five years, New Jersey has added more than 1000 WQLSs to its § 303(d) List and has implemented five TMDLs. (Locicero Decl. Ex. H–3 to H–7, I.) In the last two years, New Jersey has submitted, and EPA has approved, a number of other TMDLs. (Decl. of Kathleen Callahan dated 7–10–01 ("Callahan Decl.") ¶ 5 and App. B (listing several TMDLs for segments of various waters).) New Jersey has also dedicated substantial resources to the problem and has demonstrated its good-faith interest in collaborating with EPA to bring New Jersey's TMDL program to completion. (*See* Locicero Decl. Exs. A–58 at 12–13, H–1, H–9.) New Jersey accelerated the date for completion of TMDLs under the 1999 MOA, advancing by thirteen months—to May 2006—the final date for submission of New York/New Jersey TMDLs, that last scheduled TMDLs to be submitted for waters on the 1998 section 303(d) List. (Callahan Decl. ¶ 4 and App. A–A–1.) New Jersey and EPA have entered into an agreement under which future modifications to the MOA would not extend the current schedule past March 31, 2011. (*Id.* ¶ 4.) The proposed schedule for implementing New Jersey's TMDLs is consistent with EPA's proposed TMDL regulations, which would require that states establish TMDLs as expeditiously as practicable, but, in any event, within fifteen years (*see* 64 Fed.Reg. 46,-012, 46,027 (Aug. 23, 1999)), and the recommendations of the Federal Advisory Committee ("FACA"), which recommends that states complete their TMDL development activities within an eight to fifteen year period.[14] (Locicero Decl. Ex. A–36.)

In *NRDC III*, because New York was cooperating and had pledged itself to a reasonable timetable for completion, the district court concluded that the "intrusive injunctive remedies requested by plaintiffs" were not warranted. 93 F.Supp.2d at 541. Even in *Scott v. City of Hammond*, in which the Seventh Circuit first articulated the "constructive submission" doctrine, the court made clear that the duty to declare a constructive submission could be avoided if "EPA promptly comes forward with persuasive evidence indicating that the states are or will soon be, in the process of submitting TMDL proposals." 741 F.2d at 997 n. 11. In this case, EPA has come forward with evidence that New Jersey has submitted TMDLs and will be making such submission, and EPA therefore has avoided a duty to declare a constructive submission.

In sum, New Jersey has submitted TMDLs and has a firm plan and funding to complete outstanding TMDLs, and EPA is working to fulfill that plan. Therefore, it was not arbitrary or capricious for EPA to conclude that its duty to declare a constructive submission of no TMDLs had not been triggered. Accordingly, the Court need not reach the second element of whether agency action constituted "unreasonable delay," which requires that an agency have a duty in the first place. *See S.F. Baykeeper*, 147 F.Supp.2d at 1005; *NRDC III*, 93 F.Supp.2d at 544 ("As this Court finds that EPA is not presently under a duty to declare such a 'constructive submission,' it is illogical, and perhaps therefore unnecessary, to consider whether EPA unreasonably delayed such a dec-

---

**14.** FACA comprises environmental, industry, and government representatives. (EPA Summ. J. Br. at 24.)

laration."). A claim of unreasonable delay "is not legally viable because it is premised upon an assumption that the EPA has an affirmative duty to identify ... WQLSs and ... TMDLs. For agency action to be unreasonably delayed or unlawfully withheld, there must be a duty imposed upon an agency to undertake a particular action." *Friends of the Wild Swan, Inc. v. United States Envtl. Prot. Agency,* 130 F.Supp.2d 1184, 1192 (D.Mont.1999).

## V. COUNT FOUR: FAILURE TO CONSULT UNDER ESA

Count Four of the Fifth Amended Complaint is predicated on EPA's alleged failure to comply with section 7 of the ESA before approving New Jersey's section 303(d) Lists and TMDLs. (Fifth Am. Compl. Count Four.)

Section 7 contains the procedural safeguards of the ESA. Section 7(a)(2) imposes a procedural duty on federal agencies to consult with the FWS or the NMFS, depending on the protected species, to "insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of critical habitats of listed species. 16 U.S.C. § 1536(a)(2). An agency proposing an action [15] must determine first whether the action "may affect" listed species. 50 C.F.R. §§ 402.11, 402.14. If an agency determines that its actions "may affect" a protected species or its habitat, then the agency must enter into consultation with the FWS or NMFS to ensure that the action is not likely to jeopardize the continued existence of any listed species. 50 C.F.R. § 402.14.[16]

Two forms of consultation exist: informal and formal. Informal consultation "is an optional process that includes all discussions, correspondence, etc., between the Service and the Federal agency in determining whether formal consultation is required." 50 C.F.R. § 402.13(a). If the agency determines during informal consultation, with the written concurrence of the Service, "that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary." 50 C.F.R. § 402.13(a). If, however, the agency determines during informal consultation that its action may have adverse effect on a protected species, then the agency must request initiation of formal consultation with the Service. Also, if formal consultation is required, then the Service must prepare a biological opinion to advise the agency whether jeopardy is likely to occur and, if so, whether prudent and reasonable alternatives exist to avoid a "jeopardy" situation. 50 C.F.R. §§ 402.13, 402.14(a),(b). The consultation obligation is on-going. 50 C.F.R. § 402.16. Specifically, the agency is required to reinitiate consultation whenever a new species is listed. *Id.*

### A. *Mootness*

▬▬▬▬ Defendant argues that Claim Four is moot because it has initiated consultation with the FWS and NMFS. Article III of the United States Constitution requires that a cause of action must present a case or controversy. *DeFunis v.*

---

**15.** "Agency action" is defined as "all activities or programs of any kind authorized, funded or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas." 50 C.F.R. § 402.02.

**16.** If the agency determines that its action will have "no effect" on protected species, then consultation is not required unless the director of the FWS or NMFS specifically requests consultation with the agency. 50 C.F.R. § 402.14(a).

*Odegaard,* 416 U.S. 312, 316, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974). Under Article III, a district court "lacks subject matter jurisdiction over a dispute that is moot." *Vestcom Int'l, Inc. v. Chopra,* 114 F.Supp.2d 292, 296 (D.N.J.2000). Mootness is a jurisdictional issue that "a federal district court must resolve before it assumes jurisdiction." *North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971). Article III demands "that a plaintiff's claim be live not just when he first brings the suit but throughout the entire litigation, and once the controversy ceases to exist the court must dismiss the case for lack of jurisdiction." *Lusardi v. Xerox Corp.,* 975 F.2d 964, 974 (3d Cir.1992). The "case or controversy" requirement applies to an action for injunctive or declaratory relief. *Williams v. Alioto,* 549 F.2d 136, 141 n. 4 (9th Cir.1977).

■■■ The Third Circuit has held that a case becomes moot in two instances: (1) when the alleged violation has ceased, and no reasonable likelihood exists that the violation will recur, and (2) when interim relief or other events completely and irrevocably eradicated the effects of the alleged violation. *N.J. Turnpike Auth. v. Jersey Cent. Power & Light,* 772 F.2d 25, 31 (3d Cir.1985). The second instance is at issue in this matter. The doctrine of mootness "is centrally concerned with the court's ability to grant effective relief: 'If developments occur during the course of adjudication that eliminate a plaintiff's personal stake in the outcome of the suit or prevent a court from being able to grant the requested relief, the case must be dismissed as moot." *County of Morris v. Nationalist Movement,* 273 F.3d 527, 533 (3d Cir.2001) (quoting *Blanciak v. Allegheny Ludlum Corp.,* 77 F.3d 690, 698–99 (3d Cir.1996)). Therefore, the main question in determining mootness "is whether a change in circumstances since the beginning of the litigation precludes any occasion for meaningful relief." *Old Bridge*

*Owners Coop. Corp. v. Township of Old Bridge,* 246 F.3d 310, 314 (3d Cir.2001). Mootness "is fundamentally a matter of degree; there is no precise test for ascertaining with precision whether a particular claim has become moot." *Int'l Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths Forgers & Helpers v. Kelly,* 815 F.2d 912, 915 (3d Cir.1987).

■■■ Defendant argues that Claim Four is rendered moot because EPA initiated consultation on the 1998 CWA section 303(d) List for New Jersey and on the approved CWA TMDLs in the State by letters to the FWS and NMFS dated February 21, 2001. In light of those documents, the Court determines that Claim Four is moot. In so ruling, the Court finds particularly persuasive the reasoning in two parallel decisions: *Southern Utah Wilderness Alliance v. Smith,* 110 F.3d 724 (10th Cir.1997), and *Southwest Center for Biological Diversity v. United States Forest Service,* 82 F.Supp.2d 1070 (D.Az. 2000).

In *Southern Utah,* an environmental organization brought suit against the Bureau of Land Management ("BLM") and the Secretary of the Interior, claiming that the defendants violated section 7(2)(a) of the ESA by failing to consult with the FWS prior to implementing a land management guidance schedule. 110 F.3d at 726. As relief, the plaintiff requested a declaration that the defendants violated section 7(a)(2) of the ESA and an injunction ordering the BLM to consult with FWS. *Id.* at 727. After suit was filed, the BLM informally consulted the FWS and received its concurrence. *Id.* at 728. The court ruled that "[a]n injunction ordering consultation is no longer warranted. There is no point in ordering an action that has already taken place." *Id.* The court noted that the plaintiff failed to explain "how an injunction ordering another round of consultation

would provide any meaningful relief" and "how any injury still flows from the alleged violation." *Id.* at 728, 729. The court concluded that the defendants satisfied the consultation requirement of section 7(a)(2) and that the plaintiff failed to show that an injunction would redress any injury. *Id.* at 729. The court added that its conclusion "merely recognize[d] that the changed circumstances of [that] particular case no longer present[ed] an opportunity for meaningful relief." *Id.* Concerning the requested declaratory judgment, the court determined that "[f]or the same reasons that injunctive relief is not available, a declaratory judgment also is not available." *Id.* at 730. A declaratory judgment "would serve no purpose[,] ... would not affect the matter, and would be in the nature of an advisory opinion." *Id.* Therefore, the court held that the plaintiff's claims were moot.

Similar conclusions were reached in the second decision, *Southwest Center.* There, an environmental group sought a declaratory judgment that the United States Forest Service ("USFS") failed to fulfill its obligation to consult with the FWS under section 7(a)(2) of the ESA before the USFS issued livestock grazing permits within a national forest. 82 F.Supp.2d at 1071. The defendants initiated consultation with the FWS after the commencement of the suit and only one day before the USFS's opposition to the plaintiff's motion was due. *Id.* at 1072. The USFS argued that the plaintiff's section 7(a)(2) was moot because the defendants had begun consultation. *Id.* at 1079. The court noted that "courts should not examine claims that become moot because of changed factual circumstances during the litigation." *Id.* The court agreed that it would be merely academic for the court to order the defendants to engage in consultation, as the plaintiff's complaint requested, when the defendants already were consulting. *Id.* Therefore, the court held that the plaintiff's claim for violation of section 7(a)(2) was moot.

 In this case, we concur with the reasoning of the courts in *Southern Utah* and *Southwest Center* in holding that the EPA's commencement of consultation is sufficient to moot plaintiffs' claim for failure to consult as required by section 7(a)(2) of the ESA. Plaintiffs seek prospective relief in the form of an declaration that EPA is in violation of the ESA for failing to comply with section 7 and an injunction ordering EPA to comply with section 7. (Fifth Am. Compl. Ninth Count ¶¶ 2, 4.) Such a declaration or injunction "would serve no purpose today." *Khodara Envtl., Inc. v. Beckman,* 237 F.3d 186, 194 (3d Cir.2001) (holding that claims for declaration and injunction were moot when amendment to statute removed objectionable elements). EPA has provided plaintiffs "with what they sought to attain in bringing this suit." *Rosetti v. Shalala,* 12 F.3d 1216, 1233 (3d Cir.1993). By letters to the FWS and NMFS dated February 21, 2001, EPA initiated consultation on the 1998 CWA 303(d) list for New Jersey as well as for all approved CWA TMDLs in New Jersey (nine specific TMDLs for New Jersey waters).[17] (Decl. of Robert W. Hargrove dated 7–16–01 ¶ 5 & Ex. A & B.) EPA indicated expressly that it was "writing to initiate informal consultation" under section 7 of the ESA for those specific actions, indicated that EPA's approval of those CWA actions was not likely to adversely affect any listed species, and sought the concurrence of the FWS and the NMFS. (*Id.*) The letters seek informa-

---

17. To the extent plaintiffs are challenging EPA's section 7 compliance with the ESA with respect to past CWA section 303(d) lists approved in 1992, 1994, and 1996, such a challenge is moot because those lists have been superceded by those approved in 1998.

tion concerning listed and proposed species from those agencies.[18] (*Id.*) EPA described the relevant actions in the letters and forwarded copies of the pertinent 303(d) list and TMDLs. (*Id.*) Those actions constitute informal consultation, for such consultation "includes all discussions, correspondence, etc., between the Service and Federal agency . . . , designed to assist the Federal agency in determining whether formal consultation or a conference is required." 50 C.F.R. § 402.13(a).

■ The Third Circuit has stated that "it would be impossible for the court to grant effectual relief for a wrong that has already been remedied. Thus, if a favorable decision by a federal court could not provide the plaintiffs with more than the defendant has already given them, the entire case . . . would be moot." *Rosetti,* 12 F.3d at 1232; *see also Black United Fund of N.J., Inc. v. Kean,* 763 F.2d 156, 160–61 (3d Cir.1985) (holding that amendment mooted plaintiff's claims because "raison d'etre for the injunction no longer exists" and noting that amendment "will give plaintiff substantially the relief it sought in the district court"). Other courts have reasoned similarly. In *Greenpeace Foundation v. Mineta,* 122 F.Supp.2d 1123 (D.Haw.2000), the district court held a section 7 claim moot because the defendant agency had "already acquiesced" in requested reinitiation of section 7 consultation. *Id.* at 1128. The claim was moot because "[i]t would serve *no purpose to order* [the defendant] to do what it has already done." *Id.* In *Klamath Siskiyou Wildlands Center v. Babbitt,* No. CV–99–1044–ST, 2000 WL 236366, at *6–*7 (D.Or. Feb.15, 2000), the district court held that

the plaintiffs' claims for injunctive relief and a declaratory judgment were moot. *Id.* at *6. The plaintiff sought an injunction ordering the defendant to publish final regulations for six challenged species within thirty days and a declaration relating to the same activity. *Id.* at *5–*7. The defendant had published the regulations; therefore, the challenged government activity of unreasonably delaying publication of final regulations had "evaporated," rendering moot the requests for injunctive and declaratory relief. *Id.* at *6–*7.

Plaintiffs argue that EPA's post-hoc correspondence fails to comply with the procedural requirements of the ESA, which requires that consultation occur prior to relevant agency action. (Pls.' Br. in Supp. of Summ. J. on Claim 4 ("Pls. Claim 4 Summ. J. Br.") at 12, 13–14.) The plaintiffs in *Southern Utah* made a similar argument to the Tenth Circuit. 110 F.3d at 729. That court rejected the argument, stating that it "begs the question. Subsequent consultation is precisely the relief [the plaintiff] seeks." *Id.* Plaintiffs here also beg the question; they seek consultation, and EPA is engaging in consultation.

Plaintiff also argue that even if post-hoc consultation is permitted, such consultation is not concluded in New Jersey. (Pls.' Claim 4 Summ. J. Br. at 12, 14.) Completion, however, is not required for a finding of mootness. EPA has initiated informal consultation in accordance with the relevant regulations. EPA will have to proceed to formal consultation only if the informal consultation reveals that the EPA's activities are "likely to adversely affect any listed species or critical habitat." 50

---

18. The procedures of ESA section 7(c)(1) requiring a request for information and a biological assessment apply only when the proposed agency action is a "major construction activity" within the meaning of NEPA. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(b); 50 C.F.R. § 402.01(a); 50 C.F.R. § 402.02; *see also Newton County Wildlife Ass'n v. Rogers,* 141 F.3d 803, 811 (8th Cir.1998). In this case, EPA's action in approving CWA section 303(d) lists and TMDLs does not constitute "major construction activity" within the meaning of NEPA as a matter of law.

C.F.R. § 402.14(b)(1); *see also* 50 C.F.R. § 402.13 ("If during informal consultation it is determined by the Federal agency, with the written concurrence of the Service, that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary.") That contingency must be satisfied, and the Court declines to order EPA to complete formal consultation absent a finding flowing from informal consultation.

 A litigant "may invoke an exception to the mootness doctrine to gain judicial review." *Chong v. Dist. Dir., Immigration & Naturalization Serv.,* 264 F.3d 378, 384 (3d Cir.2001). One such exception is when the issue is deemed a wrong capable of repetition yet evading review. *Id.* at 384. Plaintiffs rely on that exception, arguing that Claim Four is not moot on that basis. (Pls.' Reply Br. in Supp. of Pls.' Mot. for Summ. J. on Claim 4 and in Opp'n to EPA's Cross–Mot. for Summ. J. on Claim 4 ("Pls.' Claim 4 Reply Br.") at 14–16.)

 "The exception from the mootness doctrine for cases that are technically moot but 'capable of repetition, yet evading review' is narrow and available 'only in exceptional circumstances.'" *County of Morris,* 273 F.3d at 534 (quoting *City of Los Angeles v. Lyons,* 461 U.S. 95, 109, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)). The Supreme Court has "permitted suits for prospective relief to go forward despite abatement of the underlying injury only in the 'exceptional situations,'" *Lewis v.*

*Cont'l Bank Corp.,* 494 U.S. 472, 481, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990) (quoting *Lyons,* 461 U.S. at 109, 103 S.Ct. 1660), when the following two circumstances are present simultaneously: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *United States v. Criden,* 675 F.2d 550, 553 (3d Cir.1982) (quoting *Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982)).[19]

 Plaintiffs have not demonstrated that this case involves such an exceptional situation because plaintiffs fail to satisfy the second condition, even if the Court assumes the first condition is met.[20] Concerning the second condition, plaintiffs argue that

> [t]here is also more than a "reasonable likelihood" that EPA's review of New Jersey's next § 303(d) List will reflect the same deficiencies, and that EPA will approve it anyway. This case alone bespeaks its certainty. The record shows that EPA has never engaged in § 7 consultation on New Jersey's § 303(d) Lists. Nor has the agency committed to consult about subsequent future § 303(d) Lists or accepted that it has a legal obligation to do so.

(Pls.' Claim 4 Reply Br. at 16–17) (citation omitted). Plaintiffs would have the Court look retrospectively to speculate about future compliance on future lists. However, "[p]ast exposure to illegal conduct does

---

**19.** In light of our ruling that plaintiffs' ESA claim is moot, we need not address EPA's argument that plaintiffs lack standing. *See Arizonans for Official English v. Arizona,* 520 U.S. 43, 66–67, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) (stating that court may assume without deciding that standing exists in order to analyze mootness).

**20.** *See Doe v. Delie,* 257 F.3d 309, 314 (3d Cir.2001) (assuming, *arguendo,* that first element (i.e., short duration) is satisfied and concluding that second element (i.e., reasonable likelihood) was not met); *OSHA Data/ CIH, Inc. v. United States Dep't of Labor,* 220 F.3d 153, 168 (3d Cir.2000) (moving directly to second element and concluding that plaintiff failed to satisfy that element).

not in itself show a present case or controversy ... if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495–96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). The Court "will not speculate on what [defendants] might do at some future time." *S.F. Baykeeper*, 180 F.Supp.2d at 1122–23. The Supreme Court "has repeatedly recognized that claims predicated upon ... speculative contingencies afford no basis for finding the existence of a continuing controversy as required by Article III." *Blanciak*, 77 F.3d at 700. Plaintiffs must demonstrate an "injury, or threat thereof, 'of sufficient immediacy and ripeness' to satisfy the jurisdictional requirements of the federal courts." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 516, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). Plaintiff have not made such a demonstration, as any relevant injury "is contingent upon a host of occurrences, each of which is just too speculative to fulfill the requirement of a present 'case or controversy.'" *Id.* at 699–700. Plaintiff has not shown that EPA is likely to violate section 7(a)(2) in connection with some future action. *See S. Utah*, 110 F.3d at 729 (determining that exception to mootness doctrine inapplicable because plaintiff failed to show likely future violation). "Broad-based 'obey the law' injunctive relief is generally prohibited." *Mannington Mills, Inc. v. Shinn*, 877 F.Supp. 921, 929 (D.N.J.1995). More importantly, the alleged violation cannot be repeated; consultation is initiated with respect to the 1998 list and TMDLs, and plaintiffs therefore cannot be "subjected to the same action again." *See Klamath Siskiyou Wildlands Ctr.*, 2000 WL 236366, at *7. Because "Article III does not permit federal courts to decide moot cases[,]" *Rosetti*, 12 F.3d at 1223, we must grant summary judgment in favor of EPA on Count Four.

## *CONCLUSION*

For the reasons expressed above, the Court will deny plaintiffs' motion to strike certain documents. As to Counts One and Two of the Complaint, the Court will deny plaintiffs' motion for judgment on the record pursuant to Federal Rule of Civil Procedure 52(a). On those same Counts, the Court will grant defendants' cross-motion for judgment on the record. As to Count Four of the Fifth Amended Complaint, the Court will deny plaintiffs' motion for summary judgment, but grant defendants' cross-motion for summary judgment.